# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WILMER RUBEN ESPINAL ALVARADO, <br><br> Petitioner, <br><br> v. <br><br> ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility, <br><br> Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) )   C.A. No. 20-10685-ADB |

## EMERGENCY AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND INJUNCTIVE RELIEF

1. The novel coronavirus that causes COVID-19 is spreading rapidly throughout the Massachusetts incarceration system. The virus is highly contagious. It has a multi-day incubation period during which an infected person shows no symptoms. The virus can be transmitted by asymptomatic people. The only known measures to mitigate its spread are impossible in communal living environments, including prisons and jails. As the City of New York Board of Correction has explained: "Given the nature of jails (e.g. dense housing areas and structural barriers to social distancing, hygiene, and sanitation), the number of patients diagnosed with COVID-19 is certain to rise exponentially."[1]

---

[1] https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Letter-from-BOC-re-NYC-Jails-and-COVID-19-2020-03-21.pdf

2. COVID-19 has been detected within the Plymouth County Correctional Facility (the "PCCF"). The PCCF houses numerous civil immigration detainees in close quarters where "physical distancing," avoiding shared surfaces and objects, and normal hygiene are impossible.

3. Petitioner Wilmer Ruben Espinal Alvarado is a civil immigration detainee at the PCCF. Mr. Espinal Alvarado suffers from asthma. He is not safe within the PCCF. His medical condition puts him at high risk of severe illness and death from COVID-19.

4. Mr. Espinal Alvarado has been detained since June 2019. There has been no final determination of whether or not he will be allowed to remain in the United States. He has never been convicted of any crime. His only charge was a non-criminal "violation" in 2016 for possessing a small amount of marijuana, for which he was ordered to pay a fine.

5. To protect his life, Mr. Espinal Alvarado seeks immediate release to a location where he may safely self-isolate for the duration of the COVID-19 outbreak. His release can be subject to GPS monitoring and any other conditions that the Court deems appropriate.

**PARTIES**

6. Petitioner Wilmer Ruben Espinal Alvarado has been held in civil immigration detention since June 2019. He is currently detained at the PCCF in Plymouth, Massachusetts. He suffers from asthma and has received medical attention for this condition while detained.

7. Respondent Antone Moniz is the Superintendent of the Plymouth County Correctional Facility and is petitioner's immediate custodian. He is sued in his official capacity only.

## JURISDICTION AND VENUE

8. This Court has jurisdiction, including pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2241 (habeas jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

9. Venue is proper because the petitioner is detained in Massachusetts.

## FACTS

**A. COVID-19 poses a grave risk of serious illness and death to everyone, and especially to people over 50 and those with certain medical conditions.**

10. The novel coronavirus responsible for the illness COVID-19 has led to a global pandemic. As of April 10, 2020, according to the World Health Organization, at least 1,521,252 people have been diagnosed with COVID-19 around the world and 92,798 have died.[2] In the United States, as of April 10, 2020, about 459,165 people have been diagnosed and 16,570 people have died thus far.[3] These numbers are likely a substantial underestimate, due to the lack of availability of testing, as well as the multi-day incubation period during which people are infected but asymptomatic.

11. The rates of infection are exponential, not linear, meaning that, for each person infected one day, the next day we should expect to see not one, but many more infections.

12. The virus is transmitted through droplets and on contaminated surfaces, and possibly also airborne transmission. The average incubation period (time from infection to

---

[2] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-81, Apr. 10, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200410-sitrep-81-covid-19.pdf?sfvrsn=ca96eb84_2.

[3] Centers for Disease Control and Prevention Coronavirus Disease 2019 Cases in the US Update, Apr. 10, 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

symptoms) has generally been reported to be around five days. Both symptomatic and asymptomatic people can transmit the virus.

13. Outcomes from COVID-19 vary from asymptomatic infection to death. In particularly vulnerable populations, the fatality rate is about 15 percent—meaning about one out of every seven people in this group who contract the illness will die. An even higher percentage will suffer serious illness.

14. Those who do not die may experience long-term harm. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.

15. People over the age of fifty and those with certain medical conditions face elevated risk of severe illness and death from COVID-19. The medical conditions that increase the risk of serious COVID-19 disease include lung disease (including asthma), heart disease, chronic liver or kidney disease (including hepatitis and dialysis), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and pregnancy.

16. There is no approved and available vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to protect vulnerable people from serious health outcomes, including death, is to prevent them from being infected with the coronavirus.

17. Preventing infection currently requires steps such as "social distancing" (such as remaining physically separated from other people by at least six feet, and avoiding the use of shared objects and surfaces) and vigilant hygiene (such as frequently washing or sanitizing the

hands). Distancing must occur *before* individuals display symptoms, as they may be contagious before they are symptomatic.

18.     To reduce the spread of infection, state and federal governments have undertaken extraordinary measures to separate people and limit their interactions. In Massachusetts, for example, the Governor has declared a state of emergency, ordered the closure of all non-essential businesses, and prohibited gatherings of more than 10 people.[4] The Governor also advised all residents to stay home and avoid all unnecessary travel and activities.[5]

19.     Preventing COVID-19 is in the public interest. People with COVID-19 often require intensive medical interventions, including hospitalization, use of a ventilator, and other life support. Consequently, an outbreak of COVID-19 cases in any discrete location—whether in a nursing home, university, or incarceration facility—presents a serious risk of overwhelming the local medical resources upon which all residents rely.

**B. Detainees at PCCF are at high risk for COVID-19 infection.**

20.     At present, there is no way to adequately protect people from COVID-19 in communal living environments, particularly people who are medically vulnerable. For example, nursing homes—where staff are trained to prevent the spread of communicable diseases—have been the sites of some of the largest concentrated outbreaks of COVID-19 in the United States.

---

[4] https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download

[5] https://www.mass.gov/news/governor-charlie-baker-orders-all-non-essential-businesses-to-cease-in-person-operation

More than 40% of all COVID-19 deaths in Massachusetts have occurred among residents of long-term care facilities.[6]

21.     Similarly, COVID-19 is spreading rapidly through the Massachusetts incarceration system.

22.     In the Massachusetts Department of Correction (the "DOC"), the number of the incarcerated people and staff who tested positive for COVID-19 nearly doubled from April 6 to April 10, 2020, increasing from 50 to 92.

23.     At the DOC's Massachusetts Treatment Center, for example, a prisoner was reportedly diagnosed with COVID-19 on or about March 21.[7] In the roughly three weeks that have followed, that number has rapidly ballooned to 37 prisoners, 10 staff, four medical vendors.[8] Three of the prisoners there recently died from COVID-19, including a man in his 50s with a medical vulnerability.[9]  Another death was reported as this petition was being filed.[10]

24.     COVID-19 is also spreading through the county Houses of Correction.  For example, based on data available as of April 11, 2020, it appears that the Middlesex County

---

[6] https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-april-12-2020/download.

[7] https://www.wbur.org/news/2020/03/21/first-mass-prisoner-covid-19-diagnosed

[8] https://twitter.com/sweetadelinevt/status/1248713424651137025

[9] https://www.wbur.org/commonhealth/2020/04/01/mass-prisons-jails-coronavirus; https://www.bostonglobe.com/2020/04/05/metro/third-inmate-bridgewater-treatment-center-dies-covid-19/.

[10] https://twitter.com/wburdebbecker/status/1249810376465813504

Sheriff's Department has reported 24 positive results among incarcerated people and staff, and the Essex County Sheriff's Department has reported 35 positive results.[11]

25. PCCF has reported that one staff member has tested positive for COVID-19. Although no incarcerated person there has tested positive, it does not appear that the incarcerated population is being robustly tested. To date, the PCCF has reported testing only four incarcerated people in its entire facility for COVID-19.

26. People incarcerated at the PCCF live in close quarters and rely on shared spaces to eat, sleep, shower, and use the bathroom. They cannot achieve the physical distancing needed to effectively prevent the spread of COVID-19. Similarly, the intensive hygiene practices necessary to prevent the spread of COVID-19 are impossible.

27. Immigration detainees at the PCCF are housed in four units, each typically holding between 50 and 100 detainees. Within each unit, people are held in communal cells with up to five bunks each. The unit takes meals together in a common area located immediately outside the cells. Although each cell has a toilet, the entire unit shares a communal bathroom, including several shared showers. The living area contains many metallic and plastic surfaces that detainees touch and breathe on, and as to which constant disinfection is impracticable. Correctional officers and staff rotate in and out of the unit. Detainees also regularly rotate in and out of the unit as they are arrested, released, or deported.

---

[11] Real-time data analysis is being posted at: https://data.aclum.org/sjc-12926-tracker/

28.     These conditions, in both sleeping and social areas, and the shared objects (furniture, bathrooms, sinks, etc.) increase the likelihood that COVID-19 will spread rapidly across the facilities, infecting vulnerable detainees.

29.      In New York City, for example, jails have become an epicenter of infectious spread. At the Rikers Island Jail in New York City, COVID-19 infection has now reportedly been confirmed in at least 318 incarcerated people.[12]  Similar patterns of infection are reportedly emerging in incarceration in facilities in other states (including Michigan and Illinois) and in the federal prison system (which has reported 13 prisoner deaths from COVID-19).[13]

### C. People Must Be Released from ICE Detention, Including Those Most Vulnerable to COVID-19.

30.     Because risk mitigation is the only known strategy that can protect people from COVID-19, public health experts with experience in immigration detention and correctional settings have recommended the release of detainees from custody, particularly including those most vulnerable to the infection.

31.     For example, Dr. Robert Greifinger, a correctional health expert, has concluded that "[a]lthough a risk mitigation strategy must include a variety of steps," the release of vulnerable people is "one of the most important steps in any such strategy." *See* Decl. of Robert B. Greifinger, MD ("Greifinger Decl.") ¶23.

32.     Recognizing these grave risks, courts have begun issuing orders requiring or urging the release of incarcerated people.  In Massachusetts, the U.S. District Court recently ordered that an immigration detainee be released from the PCCF based on the "extraordinary

---

[12] https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.

[13] https://www.bop.gov/coronavirus/.

circumstances" arising from the coronavirus pandemic. *See* Ex. A (Memorandum and Order (D.E. 507), *Calderon Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 25, 2020)). The court has also certified a class of all civil immigration detainees held at the Bristol County House of Correction, and has ordered the interim release of dozens of detainees during the pendency of that action. *See generally Celimen Savino v. Souza*, No. 20-10617, 2020 WL 1703844 (D. Mass. Apr. 8, 2020) ("*Savino* Order").

33. Similarly, the U.S. Court of the Appeals for the Ninth Circuit recently ordered the release of an immigrant from ICE detention in light of the dangers posed by the COVID-19 crisis. *See, e.g.*, *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877 (9th Cir. Mar. 24, 2020) (Order) ("[I]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final disposition by this court."). Other U.S. District Courts have issued orders requiring that immigration detainees be released in light of the coronavirus pandemic. *See, e.g.*, *A.R. v. Decker*, No. 20-3600 (D.N.J. Apr. 12, 2020); *Bent v. Barr*, No. 19-CV-06123, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020); *Ortuno v. Jennings*, No. 3:20-cv-02064-MMC, Dkt. No. 38 (N.D. Cal. Apr. 8, 2020); *Toma v. Adducci*, 20-cv-10829, Dkt. No. 29 (E.D. MI Apr. 9, 2020); *L.O. v. Tsoukaris*, 20-cv-2481, Dkt. No. 24 (D.N.J. Apr. 9, 2020); *Hope v. Doll*, No. 1:20-cv-00562 (M.D. Pa., Apr. 7, 2020); *Malam v. Adducci*, No. 2:20-cv-10829 (E.D. Mich., Apr. 6, 2020) ("[T]he only reasonable response by Respondents is the release of Petitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to Petitioner from COVID-19."); *Nguyen v. Marin*, No. 20-00646, Dkt. No. 10, (C.D. Cal. Apr. 3, 2020); Orders, *Robles v. Wolf,* No. 20-cv-627, Dkt. Nos. 32, 35, 36, 38, 39 (C.D. Cal., Apr. 2, 2020);

*Hernandez v. Wolf*, 20-cv-617, Dkt. No. 17 (C.D. Cal., Apr. 1, 2020) ("Because of the highly contagious nature of the coronavirus and the, relatively high, mortality rate of COVID-19, the disease can spread uncontrollably with devastating results in a crowded, closed facility, such as an immigration detention center."); *Avendaño Hernandez v. Decker,* No. 20-CV-1589, 2020 WL 1547459, at *4 (S.D.N.Y. Mar. 31, 2020); *Thakker v. Doll*, No. 20-00480 (M.D. Pa. Mar. 31, 2020); *Fraihat v. Wolf*, No. 20-00590 (C.D. Cal. Mar. 30, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020); *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503, at *7 (S.D.N.Y. Mar. 26, 2020).

34.     Similarly, the Massachusetts Supreme Judicial Court recently established a rebuttable presumption of release for most pre-trial detainees accused of crimes, particularly those with medical vulnerabilities.  *See* Slip Opinion, *Committee for Public Counsel Services v. Chief Justice of the Trial Court*, No. SJC-12926, at 29-30 (Apr. 3, 2020).  And the Chief Justice of the Montana Supreme Court recently urged judges to "review your jail rosters and *release, without bond, as many prisoners as you are able*, especially those being held for non-violent offenses."[14]  The Chief Justice of the South Carolina Supreme Court ordered that everyone held on bond in a non-capital case be released, unless there exists an "unreasonable danger" or "extreme flight risk."[15]  And in New Jersey, after the Supreme Court ordered briefing and

---

[14] *See* Letter from Mike McGrath, Chief Justice of Montana Supreme Court, to Montana Courts of Limited Jurisdiction Judges (Mar. 20, 2020), *available at* https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333 (emphasis added).

[15] Memo from Chief Justice Beatty to Magistrates, Municipal Judges, and Summary Court Staff (Mar. 16, 2020), *available at* https://www.sccourts.org/whatsnew/displayWhatsNew.cfm?indexId=2461.

argument on why it should not order the immediate release of individuals serving county jail sentences, the Attorney General and County Prosecutors agreed to create an immediate presumption of release for every person serving a county jail sentence in New Jersey.[16]  Many other courts have taken similar steps, recognizing that public safety means ensuring the public's health.[17]

### D. Petitioner is particularly vulnerable to COVID-19 and should be immediately released to a location where he can safely self-isolate under whatever conditions and supervision the Court deems appropriate.

35. Petitioner Wilmer Ruben Espinal Alvarado suffers from asthma.  He has been detained since June 2019.  There has been no final determination of whether or not he will be allowed to remain in the United States.  He has never been convicted of any crime.  His only charge was a non-criminal "violation" in 2016 for possessing a small amount of marijuana, for which he was ordered to pay a fine.  He is engaged to a U.S. citizen, with whom he has a U.S. citizen child.

36. Continued detention in the PCCF puts Mr. Espinal Alvarado at high risk of severe illness and death from COVID-19.

---

[16] See https://www.aclu-nj.org/files/5415/8496/4744/2020.03.22_-_Consent_Order_Filed_Stamped_Copy-1.pdf; https://www.njcourts.gov/public/assets/COVIDproposedOTSC.pdf?c=PkD

[17] *See* Appendix: Court Actions Across the Country to Reduce Incarceration in Light of Covid-19.

## LEGAL FRAMEWORK

**A. Petitioner is entitled to constitutional due process protections against infectious disease and death while detained.**

37. The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). Accordingly, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

38. Immigration detainees, even those with prior criminal convictions, are *civil detainees* held pursuant to civil immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

39. For pretrial and civil detainees, due process "provides *at least* as much protection . . . as the Eighth Amendment provides for convicted inmates." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007) (emphasis added); *accord Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). Indeed, civil detainees, like petitioner here, are entitled to conditions of confinement that are superior to those of convicted prisoners. *See Alves v. Murphy,* 530 F. Supp. 2d 380, 387 (D. Mass. 2008); *see also King v. Cty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018); *Jones v. Blanas*, 393 F.3d 918, 933-34 (9th Cir. 2004).

40. Consequently, under the Due Process Clause, pretrial and civil detainees, like petitioner, may not be subject to conditions that amount to punishment, including conditions that fail to "reasonably relate[] to a legitimate governmental objective." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *accord Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988). Accordingly, the First

Circuit has found that, at a minimum, detention conditions are unconstitutional where they: (1) objectively deny a minimal measure of necessities required for civilized living; and (2) are imposed with deliberate indifference to inmate health or safety. *Surprenant v. Rivas*, 424 F.3d 5, 18–19 (1st Cir. 2005); *Reaves v. Dep't of Corr.*, 333 F. Supp. 3d 18, 26 (D. Mass. 2018); *Couchon v. Cousins*, No. 17-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018).

41. Additionally, the Due Process Clause protects detainees, like petitioner, not only from conduct amounting to deliberate indifference, but also from objectively unreasonable conduct that creates a risk to their safety. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018). The language of *Kingsley* is broad – applying not only to use of excessive force by the government, but to government action generally, including actions involving medical treatment. *See Gordon*, 888 F.3d at 1124; *see also Couchon*, 2018 WL 4189694, at *6 (noting that there is "much to be said" for the reasoning that extends *Kingsley* to conditions of confinement cases).

42. Regardless, under either the objective unreasonableness or deliberate indifference standard, petitioner should succeed on the merits of his claim. As a court in this district recently explained, "the virus is gravely dangerous to all of us," and that harm is "more serious for some petitioners than for others." *See Savino* Order at 21. In light of petitioner's medical vulnerability to COVID-19, he is at heightened risk of severe illness and death if he remains detained, the government is aware of that extreme risk, and the risk can only be reasonably mitigated by release to self-isolate in a home setting. *See* Greifinger Decl. ¶26.

43. Further, to the extent relevant, it also clear that there are substitute measures that can achieve community safety and petitioner's future appearance, absent continued detention.

The Court can order release subject to home confinement, GPS monitoring, and other conditions that the Court deems appropriate.

44. But in all events, because the government has actual knowledge of the impending, preventable, and extreme risks that COVID-19 poses to petitioner (including death), his release is required under due process principles.

**B. Release is the only relief that can adequately protect petitioner.**

45. COVID-19 poses a serious risk to Mr. Espinal Alvarado. It is highly contagious and can cause severe illness and death. Mr. Espinal Alvarado is at a heightened risk because of his health conditions.

46. The risk that COVID-19 poses to Mr. Espinal Alvarado is known to Respondent.

47. Mr. Espinal Alvarado's continued detention in the absence of appropriate or sufficient care and protection constitutes deliberate indifference and is objectively unreasonable.

48. Medical experts for the Department of Homeland Security have also identified the risk of COVID-19 spreading to ICE detention centers. As early as February 25, 2020, Dr. Scott Allen and Dr. Josiah Rich, medical experts to the Department of Homeland Security, shared concerns about the specific risk to immigrant detainees as a result of COVID-19 with the agency. These experts warned of the danger of rapid spread of COVID-19 in immigration detention facilities. In a letter to Congress, Dr. Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." They concluded that "acting immediately will save lives not of only those detained, but also detention staff and their families, and the community-at-large."[18]

---

[18] March 19, 2020 letter from Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH to House and Senate Committees on Homeland Security, available at https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

49. John Sandweg, a former acting director of ICE, has written publicly about the need to release nonviolent detainees because ICE detention centers "are extremely susceptible to outbreaks of infectious diseases" and "preventing the virus from being introduced into these facilities is impossible."[19] Prisons and jails around the country are already releasing non-violent detainees because the risk of contagion is overwhelming. The circumstances of this case make clear that release is the only means to ensure compliance with the petitioner's due process rights. Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene, and that these measures are most imperative to protect individuals with underlying medical conditions. The only course of action that can remedy these unlawful conditions is release from the detention centers where risk mitigation is impossible.

**C. ICE has the authority to release detained people in its custody.**

50. It is well within ICE's authority to comply with these constitutional requirements by releasing people who are vulnerable to severe illness or death if they contract COVID-19. For example, the regulations governing ICE's release authority state that serious medical conditions are a reason to parole an individual, as "continued detention would not be appropriate" in such cases. 8 C.F.R. § 212.5(b)(1).

51. ICE not only has the authority to exercise discretion to release individuals from custody, but has routinely exercised this discretion to release particularly vulnerable detainees like petitioner.

---

[19] *See* John Sandweg, "I Used to Run ICE. We Need to Release the Nonviolent Detainees." The Atlantic (March 22, 2020), available at https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.

**D. This Court has the authority to order preliminary release pending resolution of this petition under the principles of *Mapp v. Reno*.**

52.     During the pendency of this action, the Court should order Mr. Espinal Alvarado's interim release under the principles of *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001).  Under *Mapp*, a court may order a habeas petitioner released on an interim basis after "inquir[ing] into whether 'the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective.'" *Id.* at 230 (quoting *Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)) (alterations in original).[20]  Courts in this district and others have recently applied *Mapp* and its First Circuit analogues to order pre-judgment release for immigration detainees challenging their detention in light of the COVID-19 pandemic.  *See, e.g.*, *Savino* Order at 27-28; *Avendaño Hernandez v. Decker*, No. 20-CV-1589 (JPO), 2020 WL 1547459, at *2-4 (S.D.N.Y. Apr. 1, 2020); *Calderon Jimenez v. Wolf*, No. 18-10225-MLW, (D. Mass. Mar. 26, 2020) (Ex. A).

53.     Here, as in those cases, this "nightmarish pandemic" constitutes "exceptional circumstances," and Mr. Espinal Alvarado has raised "substantial claims" that his detention is unconstitutional in light of the COVID-19 pandemic.  *Savino* Order at 27-28 & n.11.[21]  Habeas will not be an effective remedy for him if he is no longer alive.

---

[20] Whereas *Mapp* required only that the petitioner raise "substantial claims" on the merits, the First Circuit – considering a habeas petition from a convicted state prisoner – articulated a higher standard.  *See Glynn v. Donnelly*, 470 F.2d 95, 98 (1972).  However, the First Circuit's test should not extend to immigration detainees, who retain the presumption of innocence, and "the *Mapp* test or something similar or perhaps less is appropriate" in the immigration context.  *Jimenez v. Wolf*, No. 18-10225-MLW, Memorandum & Order, ECF No. 507 (D. Mass. Mar. 26, 2020) at 1-2.; *see also Savino* Order at 27-28 n.11.

[21] As this Court observed in the *Savino* order, a petitioner's challenge to detention in light of the COVID-19 pandemic "would also satisfy a more exacting standard" like the one articulated by the First Circuit in *Glynn*.  *See Savino* Order at 28 n.11.

54. This Court should therefore order Mr. Espinal Alvarado's interim release while the Court considers and resolves this matter.

### E. This Court has the authority to order release as a final remedy.

55. "[H]abeas corpus is, at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), and "[f]ederal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). As a result, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also* 28 U.S.C. § 2243; *Boumediene v. Bush*, 553 U.S. 723, 779-80 (2008) (explaining that "common-law habeas corpus was, above all an adaptable remedy," that the "habeas court's role was most extensive in cases of pretrial and noncriminal detention," and that "when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority . . . to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release").

56. Courts have regularly exercised this authority to remedy constitutional violations caused by overcrowding. *See, e.g.*, *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).

57. The same principle applies here. As the constitutional principles and public health experts make clear, releasing Mr. Espinal Alvarado is the only viable remedy to ensure his safety. The Court may condition that release on the use of GPS monitoring and any other conditions it considers appropriate.

## CLAIM FOR RELIEF

### Count I: Violation of Fifth Amendment Right to Due Process

58. The Fifth Amendment of the Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it subjects civil detainees to cruel treatment and conditions of confinement that amount to punishment or does not ensure those detainees' safety and health.

59. Petitioner's confinement subjects him to a heightened and unacceptable risk of contracting COVID-19, for which there is no vaccine or cure. Because of petitioner's particular vulnerabilities, he is at elevated risk of serious illness and death if infected with COVID-19. Respondent, acting unreasonably and with deliberate indifference, is subjecting petitioner to a substantial risk of serious harm, in violation of his rights under the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE petitioner requests that the Court immediately grant the following relief:

a. Order petitioner's immediate interim release pending the Court's consideration and resolution of this matter, including pursuant to *Mapp v. Reno*;

b. Issue a Writ of Habeas Corpus or other suitable order for injunctive relief and order petitioner's' immediate release, with appropriate conditions and precautionary public health measures;

c. Grant any other and further relief that this Court may deem fit and proper.

Dated: April 13, 2020
　　　　　　　　　　　　　　　　*/s/ Daniel L. McFadden*
　　　　　　　　　　　　　　　　Matthew R. Segal (BBO # 654489)
　　　　　　　　　　　　　　　　Daniel McFadden (BBO # 676612)
　　　　　　　　　　　　　　　　Adriana Lafaille (BBO # 680210)
　　　　　　　　　　　　　　　　Laura K. McCready (BBO # 703692)
　　　　　　　　　　　　　　　　AMERICAN CIVIL LIBERTIES UNION

FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA 02110
(617) 482-3170
msegal@aclum.org
dmcfadden@aclum.org
alafaille@aclum.org
lmccready@aclum.org

David C. Fathi (WA 24893)**
Eunice H. Cho (WA 53711)**
AMERICAN CIVIL LIBERTIES UNION FOUDATION,
NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor
Washington, DC  20005
T: 202-548-6616
E: dfathi@aclu.org
E: echo@aclu.org

Michael K. T. Tan*
Anand V. Balakrishnan*
Rebecca A. Ojserkis*
Omar C. Jadwat*
ACLU FOUNDATION IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Tel: 212-549-2660
mtan@aclu.org
abalakrishnan@aclu.org
rojserkis@aclu.org
ojadwat@aclu.org

Sarah Sherman-Stokes (BBO# 682322)
Associate Director
IMMIGRANTS' RIGHTS AND HUMAN TRAFFICKING
PROGRAM
BOSTON UNIVERSITY SCHOOL OF LAW
765 Commonwealth Avenue
Room 1302F
Boston, MA 02215
T. 617-358-6272
sstokes@bu.edu

Susan B. Church (BBO# 639306)
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 01

Cambridge, MA 02139
Tel. (617) 354-3944
sbc@demissiechurch.com

Kerry E. Doyle (BBO# 565648)
GRAVES & DOYLE
100 State Street, 9th Floor
Boston, MA 02109
(617) 542-6400
kdoyle@gravesanddoyle.com

*pro hac application forthcoming
**pro hac application forthcoming; not admitted in D.C.; practice limited to federal courts