UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILMER ESPINAL ALVARADO | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-10685-ADB |
| | ) | |
| ANTONE MONIZ, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION TO DENY PETITIONER'S HABEAS PETITION**

ANDREW E. LELLING
United States Attorney

JASON C. WEIDA
Assistant U.S. Attorney

United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts  02210
(617) 748-3180
jason.weida@usdoj.gov

Dated: April 16, 2020                    *Attorneys for the Government*

Respondent Antone Moniz, Superintendent of the Plymouth County Correctional Facility ("Respondent"), respectfully submits this memorandum of law in support of his motion to deny Petitioner Wilmer Espinal Alvarado's ("Petitioner") Emergency Amended Petition for Writ of Habeas Corpus and Injunctive Relief (the "Alvarado Petition") (Doc. # 8) for lack of subject matter jurisdiction and for failure to state a claim on which relief can be granted.

## BACKGROUND

### A.     COVID-19 In Massachusetts.

On March 10, 2020, Governor Charlie Baker declared a state of emergency in Massachusetts based on the 2019 novel Coronavirus ("COVID-19") that originated in Wuhan, China.[1]  As of April 16, 2020, there are 29,918 cases of COVID-19.[2]  Of those 29,918 cases of COVID-19 in Massachusetts, 2,308 cases are in Plymouth County.[3]  The population of Plymouth County is around 521,202.[4]  Based on those figures, less than half of one percent of the population in Plymouth County has COVID-19 (2,308 out of 521,202).  The Town of Plymouth, where the Plymouth County Correctional Facility ("PCCF") is located, has 108 cases of COVID-19.[5]  With a population of 60,803,[6] less than 2/10th of one percent of the population of the Town of Plymouth has COVID-19 (108 out of 60,803).

---

[1] *See* https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (last visited Apr. 14, 2020).

[2] *See*  https://www.mass.gov/doc/covid-19-cases-in-massachusetts-as-of-april-15-2020/download (last visited Apr. 16, 2020).

[3] *See id.*

[4] *See* https://www.census.gov/quickfacts/plymouthcountymassachusetts (last visited Apr. 14, 2020) (estimate dated July 1, 2019).

[5] *See*  https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring  (last visited Apr. 16, 2020) (link to Word document on webpage).

[6] *See*  https://www.census.gov/quickfacts/plymouthtownplymouthcountymassachusetts (last visited Apr. 16, 2020) (estimate dated July 1, 2018).

**B.      Efforts To Prevent Exposure To COVID-19
         At The Plymouth County Correctional Facility.**

PCCF is a correctional facility that houses inmates and detainees, including detainees like Petitioner here.  The Plymouth County Sheriff's Department ("Department") operates the PCCF. *See* Decl. of Joseph D. McDonald, Jr., attached as <u>Exhibit A</u> hereto, ¶ 2.  The Department has a contract with the Correctional Psychiatric Services ("CPS") to provide comprehensive medical services to inmates and detainees at the PCCF.  *See* Decl. of Lawrence Baker, M.D., attached as <u>Exhibit B</u> hereto, ¶ 1.  The Department and CPS provide services to Petitioners pursuant to an Inter-Governmental Service Agreement ("IGSA") with the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and are monitored by the ICE Health Service Corps ("IHSC").  *See* Decl. of Alan Greenbaum, attached as <u>Exhibit C</u> hereto, ¶¶ 3-4.  As described below, all three entities—the Department, CPS, and ICE—have endeavored and succeeded through the present time to prevent exposure to inmates and detainees at PCCF.

**1.      The Plymouth County Sheriff's Department Has Instituted Protocols At The
         Plymouth County Correctional Facility To Prevent Exposure to COVID-19.**

Since the onset of COVID-19, the Department has instituted strict protocols at PCCF to prevent exposure to inmates and detainees.  Ex. A ¶ 5.  Those protocols include the following:

- Beginning in February, the Department enhanced its inmate intake procedure to obtain additional information about travel and exposure to illness.  *Id.* ¶ 6.

- The Department has adopted treatment and detection practices consistent with guidelines from the Centers for Disease Control and Prevention ("CDC") and the Massachusetts Department of Public Health ("DPH").  The Department's health services administrator is in frequent contact with DPH and consults them on the challenges facing the Department.  *Id.*

- The Department suspended visits by friends, families, and volunteers.  To assist with the transition, the Department arranged with its telephone vendors to provide two free calls per week.  *Id.*

- The Department restricted attorney visits to non-contact. The Department disabled monitoring and recording functions for visit phones. *Id.*

- The Department has kept non-essential staff from entering the Facility, consistent with Governor Baker's order for executive staff. *Id.*

- The Department has ceased inmate assignments to the farm operation, community work crew, and other work details outside PCCF. *Id.*

- The Department has eliminated unnecessary movement within PCCF. *Id.*

- The Department established a housing unit for newly admitted inmates and inmates who leave and return to PCCF, to monitor for signs and symptoms of the virus. Inmates remain in the unit until they clear the incubation period. *Id.*

- The Department has worked with state trial court officials to limit travel outside PCCF by conducting hearings by videoconference and telephone. This greatly has reduced travel to and from PCCF and resulting potential exposure.

- The Department has changed recreation and meal schedules to provide more space in the dayrooms. Inmates and detainees in standard large and small housing units have split recreation schedules so that approximately half are permitted access to the day room at one time. The inmates and detainees have split meal periods, as well. *Id.*

- The Department maintains an aggressive cleaning schedule for the housing units and conducts daily sanitation of transportation vans. *Id.*

- The Department has educated staff and inmates on sanitation practices and proper social distancing. The Department provides soap to the inmates and detainees weekly and as needed. The Department also provides cleaning supplies. *Id.*

- The Department conducts temperature screenings for all employees, contractors, and visitors to PCCF. *Id.*

- The Department has provided surgical masks for all PCCF staff and inmates. *Id.*

**2. Correctional Psychiatric Services Deployed Clinical Guidelines To Prevent Exposure to COVID-19 At The Plymouth County Correctional Facility.**

In addition to the Department's protocols described above, CPS deployed a set of clinical guidelines, titled CPS Clinical Guideline for COVID-19/CORONAVIRUS ("CPS Clinical Guideline"), to educate and guide CPS staff, including the seven fulltime staff members at PCCF. Ex. B ¶¶ 6, 8. "The CPS Clinical Guideline follows the most recent guidance pertaining to correctional and detention facilities from the Centers for Disease Control and U.S. Immigration and Customs Enforcement, as well as recommendations from the Massachusetts Department of Public Health and the World Health Organization." *Id.* ¶ 8.

Among other things, the CPS Clinical Guideline provides as follows:

- The CPS Clinical Guideline lists the possible symptoms of a COVID-19 infection and states that upon identification of any of those symptoms (*i.e.*, fever, cough, shortness of breath, loss of smell or taste, sore throat, tiredness, or diarrhea) the patient should immediately be masked. *Id.* ¶ 9.

- The CPS Clinical Guideline provides that if a patient presents with fever and any other symptoms then the medical staff is to perform a rapid test for Influenza A and B. If the influenza test is negative, then medical staff is to test for COVID-19. If a COVID-19 test is positive, then staff are instructed to monitor vital signs, especially temperature and oxygen saturation twice a day; offer acetaminophen 650 mg. twice per day or as needed for coronavirus symptoms for one week; monitor the patient's respiratory status to include oxygen saturation, trouble breathing, persistent chest pain or pressure, new onset of confusion or inability to arouse and any signs of cyanosis, and nurses are to notify the on-call doctor immediately if any symptoms are present and discuss possible transport to the local emergency room; and restrict patient movement unless emergent for anyone in isolation. Any movement while in isolation requires that staff wear a mask with shield, gloves and gown. *Id.* ¶ 10.

- The CPS Clinical Guideline also provides for the medical isolation of a patient with suspected COVID-19 infection be maintained until all the following criteria have been met:

a. For individuals who will be tested to determine if they are still contagious: the individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND the individual's other symptoms have improved (e.g., cough, shortness of breath) AND the individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart.

b. For individuals who will NOT be tested to determine if they are still contagious: the individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND the individual's other symptoms have improved (e.g., cough, shortness of breath) AND at least 7 days have passed since the first symptoms appeared.

c. For individuals who had a confirmed positive COVID-19 test but never showed symptoms: At least 7 days have passed since the date of the individual's first positive COVID-19 test AND the individual has had no subsequent illness.

*Id.* ¶ 11.

- The CPS Clinical Guideline provides for restriction of patients from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns. *Id.* ¶ 12.

In addition to the CPS Clinical Guideline, CPS has taken the following steps:

- ***New Detainee Screening***. Upon receiving a new detainee/inmate, medical staff screen the individuals for signs and symptoms of infection. This includes event travel history, temperature checks, taking a recent medical history and observing the individual for any signs of sickness. If an individual appears symptomatic on admission a mask is applied immediately, the individual is placed in isolation and clinical care guidelines are followed (as outlined above) thereafter. *Id.* ¶ 18.

- ***Detainee Education and Monitoring***. Nursing staff have also been instructed to use any detainee/inmate interaction as a time to educate the detainee/inmate regarding COVID-19, including that all inmates need to wash their hands frequently, avoid crowds and stay apart at least six feet whenever possible, and to report any shortness of breath or concerns of fever immediately to either nursing or security. Additionally, signs have been posted in all units in English, Spanish,

Portuguese and Chinese, indicating that if a detainee/inmate feels sick, they should notify medical staff and have a mask applied immediately. Detainees and inmates are also being educated during medical encounters on the signs and symptoms of a COVID-19 infection. *Id.* ¶¶ 16-17.

- ***Monitoring of Vulnerable Detainees***. CPS staff are monitoring and reviewing all detainees and inmates who are known to have chronic disease or other co-morbidities which would make them more susceptible to a COVID-19 infection. *Id.* ¶ 20.

- ***Staff Training and Supplies***. COVID-19 health information has been posted in all units and visiting areas. Staff have access to CDC materials, including posting the link/url for the CDC website on all medical area computer equipment. A training website for CPS medical staff has been developed as well as a COVID-19 power point. Staff have access to masks, disinfectant/sanitizer and other personal protective equipment. *Id.* ¶ 15.

- ***Staff Precautions***. CPS also is taking steps to ensure that staff do not inadvertently introduce COVID-19 into the facility by educating staff and screening them for raised temperatures or other signs of illness. Staff have been instructed not to work if they feel ill and to report any symptoms for follow up. Staff have also been educated regarding both their own protection as well as CDC guidelines for eliminating virus transmission. *Id.* ¶ 19.

3. **ICE Provides Guidance To PCCF And The ICE Health Service Corps Monitors The Medical Care Provided To ICE Detainees At PCCF.**

In addition to the above steps taken by the Department and CPS, ICE itself provides monitoring and guidance to the medical staff at PCCF. Specifically, IHSC uses Field Medical Coordinators who serve as medical consultants to the ICE field offices and monitor clinical services provided at IGSA facilities that house ICE detainees, including PCCF. Ex. C ¶ 3. Moreover, on April 10, 2020, ICE "released its *ERO COVID-19 Pandemic Response Requirements (PRR)*," which is a guidance document for detention facilities housing ICE detainees, like PCCF. *Id.* ¶ 5. As described above, CPS is complying with this guidance. *See* Ex. B.

**C.      The Lack of Any COVID-19 Case Among Inmates And
Detainees At The Plymouth County Correctional Facility.**

There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF.  Ex. A ¶ 7; Ex. B. ¶ 24; Ex. C ¶ 6.  There has been one case of COVID-19 of a PCCF staff member.  Ex. A ¶ 8; Ex. B. ¶ 25.  That individual's last day at PCCF was March 19, 2020.  The individual did not have close contact with any inmates or detainees.  Ex. A ¶ 8; Ex. B. ¶ 25.  The staff members that had close contact with that individual were sent home and were not permitted to return to PCCF for at least 14 days.  Ex. A ¶ 8; Ex. B. ¶ 25.  To date, that is the only case of COVID-19 at PCCF.  Ex. A ¶¶ 7-8; Ex. B. ¶¶ 24-25; Ex. C ¶ 6.

**D.      The Multi-Petitioner Habeas Petition In This Case.**

On April 7, 2020, Pedro Wabibi Augusto and sixty-four other immigration detainees (of which Petitioner here was one) filed a petition for a *pro se* writ of habeas corpus under 28 U.S.C. § 2241 (the "Augusto Petition").  Doc. # 1; *see also* Doc. # 3 (describing the Augusto Petition). The Augusto Petition alleged generally, without alleging facts specific to any one of the petitioners individually, that the petitioners' detention increased their risk of COVID-19, *see generally* Doc. # 1, and sought the "release from detention" of all of the petitioners.  *Id.* at p.7.

The 65 petitioners in the Augusto Petition are a diverse group of ICE detainees.  As shown in the attached document, the petitioners are from a variety of countries and are detained under different statutes.  *See* Compendium of Summaries, attached as <u>Exhibit D</u> hereto.  Some are subject to mandatory detention based on criminal histories.  *Id.*  Some have been denied release by an immigration judge due to a finding of public safety or flight risk.  *Id.*  Some have final orders of removal that ICE is seeking to effectuate.  *Id.*  Most appear to be in good health.  *Id.*  Others have preexisting conditions that vary among them.  *Id.*  Some have pending habeas petitions in addition to this habeas case.  *Id.*

As of April 15, 2020, 58 of the original 65 petitioners in the Augusto Petition are still detained at PCCF. *See* Ex. A ¶¶ 9, 12.  The petitioners who are no longer detained at PCCF either have been released on bond or transferred to other facilities.  Ex. D.  Of the 58 petitioners that remain, 57 of them—including Petitioner here—are "housed in Unit C3, a large direct supervision housing unit with a maximum capacity of 139 inmates. . . . As a result of the low population in the unit, each detainee has his own cell."  Ex. A ¶ 9.

When those petitioners—including Petitioner here—are out of their cells, such as during recreation and meals, the Department takes a variety of precautions.  For example:

- ***Social Distancing During Recreation and Meals***.  To permit and encourage social distancing, the security staff spread out the day room chairs in the unit.  The Department conducts split recreation, with each side of the unit entering the day room at different times.  The split recreation periods provide much more space in the day room and offer significant opportunity for social distancing. The Department similarly provides meals for each side of the unit at different times.  This provides detainees multiple seating options which provide significant opportunity for social distancing. *Id.* ¶ 10.

- ***Sanitation***.  At the end of each recreation period, unit workers sanitize the unit.  Workers clean all tables, phones, day room chairs, showers, and cell door handles with 100 product multi-use disinfectant 256.  Laundry workers clean all mop heads and cleaning rags every morning.   Maintenance officers use Virex spray to disinfect showers, day room chairs, tables, phones, all door handles, and railings in the morning before recreation periods begin.  A cleaning crew cleans all visit rooms and sally ports with Virex fogging spray. *Id.* ¶ 11.

- ***Sanitary Supplies***.  The Department provides the detainees soap weekly and as needed and provides the detainees the cleaning supplies they need.  The detainees have access to the 100 product disinfectant to clean their cells.  The Department provides toilet paper each week and as needed.  The Department runs a laundry unit to keep clothing clean. *Id.*

**E.      Petitioner Wilmer Espinal Alvarado.**

      **1.      Petitioner's Detention, His General Medical Condition As Reported
When He Was Detained, And His Medical Treatment While In Detention.**

Petitioner, age 27, is a native and citizen of Honduras who entered the United States
without inspection at an unknown time and location.  *See* Decl. of David Wesling, attached as
Exhibit E hereto, at ¶ 5.  He entered into ICE custody on June 6, 2019, after being stopped by a
local police department for a motor vehicle violation.  *Id.* ¶ 6.  He is currently detained at PCCF.

Petitioner's medical information that is relevant to this case is contained in the following
three documents submitted today under seal:

- **Declaration of Marcia Norat, R.N., submitted under seal as
  Exhibit F.**

  Ms. Norat is the Health Services Administrator at PCCF.  Her
  declaration contains information about Petitioner's medical history
  and treatment while in detention at PCCF, based on her review of
  Petitioner's medical records and information from other relevant
  healthcare providers, including PCCF's physician.

- **Declaration of Alan Greenbaum, submitted under seal as
  Exhibit G.**

  Mr. Greedbaum is an Assistant Field Office Director for ICE.  His
  declaration contains information regarding Petitioner's general
  medical condition as reported when he was detained and his medical
  treatment while in detention, based on his review of Petitioner's
  medical records and information from PCCF.

- **Petitioner's Medical Records, submitted under seal as Exhibit H.**

  In addition to the above declarations, Respondent is submitting
  Petitioner's medical records themselves for the Court's review.

As described in the above declarations, Petitioner's healthcare providers attest, based on his
medical records and their observations while Petitioner has been in detention, that his "asthma
does not put him at increased risk to COVID-19."  Ex. F; Ex. G.

**2.      Petitioner's Habeas Case Currently Pending Before Judge Saris.**

Because Petitioner had no lawful basis to be in the United States when he was stopped, ICE detained him and served him with a Notice to Appear.  *Id.*  An immigration judge determined that Petitioner was subject to mandatory detention under 8 U.S.C. § 1226(c), and that the immigration judge therefore lacked jurisdiction to consider his request for a bond hearing.  *Id.*  Petitioner reserved appeal of the immigration court's decision but did not perfect an appeal to the Board of Immigration Appeals (the "Board").  *Id.*  On December 4, 2019, the immigration court ordered Petitioner be removed from the United States.  *Id.* ¶ 13.  Petitioner reserved appeal of that decision, and his appeal and motion to remand is currently pending with the Board.  *Id.*

On February 12, 2020, Petitioner filed a *pro se* habeas petition challenging his detention.  *See Alvarado v. Moniz*, No. 20-10309-PBS (D. Mass.) (Doc. # 1).  On February 20, 2020, an attorney entered a notice of appearance on his behalf (one of the same attorneys who represents him in the present case), and filed an amended petition.  *Id.* (Doc. # 10).  Among other things, Petitioner disputes that he is subject to mandatory detention under 8 U.S.C. § 1226(c), argues that he is entitled to a bond hearing under *Brito v. Barr*, No. 19-11314, 2019 WL 6333093 (D. Mass. Nov. 27, 2019), and argues that, if he were subject to mandatory detention, then his detention is unlawful and prolonged under *Reid v. Donelan*, 390 F. Supp. 3d 201 (D. Mass. 2019).

On April 10, 2020, the government moved to dismiss Petitioner's amended petition. *Alvarado*, No. 20-10309-PBS (Doc. # 15).  The government argued, among other things, that the court lacked jurisdiction to review whether Petitioner was subject to mandatory detention under 8 U.S.C. § 1226(c).  *Alvarado*, No. 20-10309-PBS (Doc. # 16) (citing *Flores-Powell v. Chadbourne*, 677 F. Supp. 2d 455, 464-66 (D. Mass. 2010)).  Petitioner has not yet responded to the government's motion to dismiss, which currently remains pending before Judge Saris.

### 3.      The Alvarado Petition In This Case.

On April 14, 2020, Petitioner, represented by lawyers from the American Civil Liberties Union and the same attorney who represents him in the habeas case pending before Judge Saris, filed the Alvarado Petition in this case.  Doc. # 8.  Unlike the Augusto Petition, which contained only general allegations without facts specific to any one of the petitioners individually, the Alvarado Petition is unique to Petitioner.  *See generally id.*  Specifically, the Alvarado Petition alleges that Petitioner "suffers from asthma," that "[h]e is not safe within the PCCF," and that "[h]is medical condition puts him at high risk of severe illness and death from COVID-19."  *Id.* ¶ 3.  According to Petitioner, "the risk can only be reasonably mitigated by release to self-isolate in a home setting."  *Id.* ¶ 42; *see also id.* ¶ 49 ("The only course of action that can remedy these unlawful conditions is release from the detention centers where risk mitigation is impossible.").  Thus, Petitioner "seeks immediate release to a location where he may safely self-isolate for the duration of the COVID-19 outbreak."  *Id.* ¶ 5.

On April 14, 2020, the same day the Alvarado Petition was filed, the Court ordered Respondent to respond within two days.  Doc. # 17.  This timely motion followed.

## STANDARD OF REVIEW

Because federal courts are considered courts of limited jurisdiction, "federal jurisdiction is never presumed."  *Viqueira v. First Bank,* 140 F.3d 12, 16 (1st Cir. 1998).  Rather, "'the party invoking the jurisdiction of a federal court carries the burden of proving its existence.'"  *Murphy v. United States,* 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.,* 987 F.2d 57, 60 (1st Cir. 1993)).  "Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction."  *Excel Home Care, Inc. v. U.S. Dep't of Health & Human Servs.*, 316 B.R. 565, 567 (D. Mass. 2004).  "In ruling on a motion to dismiss for lack of jurisdiction, 'the district court must construe the complaint

liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of plaintiff.'" *Id.* at 568 (quoting *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996)). "That is not to say that this leniency eliminates the plaintiff's burden of proving an appropriate jurisdictional basis. Indeed, a plaintiff cannot assert a proper jurisdictional basis 'merely on unsupported conclusions or interpretations of law.'" *Id.* (quoting *Murphy,* 45 F.3d at 522).

Just as a plaintiff bears the burden of establishing subject matter jurisdiction, so too "the plaintiff bears the burden of plausibly alleging a viable cause of action" under Rule 8(a). *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). The "'tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Feliciano-Hernández v. Pereira-Castillo*, 663 F.3d 527, 533 (1st Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). Rather, "'only a complaint that states a plausible claim for relief survives a motion to dismiss'" under Rule 12(b)(6). *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## <u>ARGUMENT</u>

## I.  THE ALVARADO PETITION MUST BE DENIED BECAUSE PETITIONER LACKS STANDING.

As an initial matter, Petitioner lack standing. It is fundamental that the Constitution "confers limited authority on each branch of the Federal Government." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546-47 (2016). As relevant here, the judicial power of the United States is limited to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 157 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).   Standing thus "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).   The standing inquiry also focuses on whether a particular plaintiff is the proper party to challenge government conduct. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

As the party invoking federal jurisdiction, a plaintiff must establish the three elements that constitute the "irreducible constitutional minimum" of standing: that (i) it suffered an injury in fact (ii) fairly traceable to the challenged government conduct (iii) that is likely to be redressed by a favorable judicial decision.   *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). Moreover, a plaintiff must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted), *remanded to Laroe Estates, Inc. v. Town of Chester*, 693 F. App'x 69 (2d Cir. 2017).   The standing inquiry is "especially rigorous" where, as here, a plaintiff asks a federal court "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819-20.

In this case, Petitioner has established neither injury in fact nor redressability.

### A.   Petitioner Lacks Injury In Fact.

To establish injury in fact, a plaintiff must first show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"   *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Injury in fact is a "constitutional requirement" and is the "[f]irst and foremost" of standing's three elements.   *Id.* at 1547-48 (quoting *Steel Co.*, 523 U. S. 83, 103 (1998)).   To be "particularized" the injury "must affect the plaintiff in a personal and individual way."   *Lujan*, 504 U.S. at 560 n.1.

"Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Spokeo, Inc*, 136 S. Ct. at 1548. A "concrete" injury must be "'*de facto*'; that is, it must actually exist[,]" that is, it must be "real," and not "abstract." *Id.* While "the risk of real harm" may, in some circumstances, be sufficiently concrete, "imminence . . . cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is '*certainly* impending.'" *Lujan*, 504 U.S. at 568.

Petitioner's alleged harm—that his detention increases his risk of harm from COVID-19—is speculative based on the site-specific circumstances at PCCF. *E.g., Spokeo, Inc.*, 136 S. Ct. at 1548 (injury in fact cannot be "conjectural or hypothetical"); *Lujan*, 504 U.S. at 568 (injury in fact cannot be "speculative"). There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF. Ex. A ¶ 7; Ex. B. ¶ 24. Although there has been one case of COVID-19 of a PCCF staff member, it has been 28 days since that individual was last at PCCF. Ex. A ¶ 7; Ex. B. ¶ 24. To put that into perspective, 28 days is more than five times the median incubation period (about five days) and double the CDC's recommended quarantine period (14 days). Indeed, the fact that a staff member tested positive for COVID-19 in mid-March, and yet there are zero cases of COVID-19 in the inmate and detention population as of April 15, indicates that PCCF's efforts *are working*. Those undisputed facts fatally undermine Petitioner's claim that the efforts to prevent exposure to COVID-19 at PCCF are insufficient to the point where they *require* the highly extraordinary remedy of release.

In addition, Petitioners cannot meet the imminence requirement based on the specific facts of this particular case. *E.g., Spokeo, Inc.*, 136 S. Ct. at 1548 (injury in fact must be "actual or imminent"); *Lujan*, 504 U.S. at 568 (injury in fact must be "*certainly* impending"). Petitioner is "housed in Unit C3, a large direct supervision housing unit with a maximum capacity of 139

inmates.  As of April 15, the count was 57.  As a result of the low population in the unit, *each detainee has his own cell*."  Ex. A ¶ 9 (emphasis supplied).  And, when Petitioner is outside of his cell, such as during recreation and meals, PCCF takes a variety of precautions that reasonably provide for adequate social distancing.  *Id.* ¶¶ 10-11.

While Petitioner has reported having asthma, Petitioner's own healthcare providers attest, based on his medical records and their observations while Petitioner has been in detention, that his "asthma does not put him at increased risk to COVID-19."  Ex. F; Ex. G.  Petitioner submitted declarations in which a non-treating physician and his own lawyer with no stated medical training offered their opinions regarding Petitioner's asthma and its associated risks.  *See* Doc. # 10 ¶ 25 (non-treating physican); Doc. # 12 ¶¶ 5, 8 (lawyer).  Even if those opinions were weighed equally against those of Petitioner's own healthcare providers (and they should not be), they cannot manufacture injury in fact for Petitioner in light of the unique circumstances in this case: (1) the presence of a much earlier staff case that did not result in any cases among the detainee population, and (2) a separate cell for Petitioner.[7]

### B. Petitioner's Alleged Injury—A Heightened Risk For Serious Illness Or Death From COVID-19—Is Not Redressable By Release.

Separately, Petitioner lacks standing because his alleged injury—that he is subject to a heightened risk of death from COVID-19—will not be redressed by ordering his release.  "Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury."  *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.).  For

---

[7] Thus, this case is materially distinguishable from other cases seeking similar relief.  For example, none of these facts were present in *Savino v. Souza*, No. 20-10617, 2020 WL 1703844, (D. Mass. Apr. 8, 2020), where Judge Young found that the petitioners had standing.  *Id.* at *4. There, Judge Young relied on different facts at the Bristol County House of Correction, where the petitioners slept in "a large room packed with rows of bunk beds."  *Id.* at *3.

purposes of standing, a plaintiff's injury is redressable where there is "a 'substantial likelihood' that the requested relief will remedy the alleged injury." *Vermont Agency of Natural Res. v. United States* ex rel. *Stevens,* 529 U.S. 765, 771 (2000) (citation omitted).  Petitioner's desired relief—release from detention—will not ameliorate his claimed heightened risk of injury or death resulting from COVID-19, nor can release prevent him from contracting COVID-19.

Petitioner offers no proof—nor is Respondent aware of any—that his release from PCCF, a facility without a single case of COVID-19 in the inmate and detainee population, into Massachusetts, which has declared a state of emergency based on the COVID-19 crisis, or anywhere else, will reduce his risk of injury or death.  *See generally* Doc. # 8.  Although infection rates in Plymouth County are relatively low (less than half of one percent of the population), that rate is higher than zero—the current infection rate among inmates and detainees at PCCF.

Moreover, it cannot be overlooked that PCCF provides medical care at no cost to detainees, including Petitioner.  By reason of his detention, Petitioner has greater access to robust medical care than many in the general public.  Ordering his release from PCCF would leave Petitioner without his present access to health care and could put him at greater risk of serious complications in the event that he contracts COVID-19.  As Dr. Baker attests generally in his declaration:

> While it is clear that a prison setting poses particular challenges from an infectious disease stand-point, the risk of infection is tempered by the degree of control we have over access to the facility.  We are screening incoming detainees/inmates carefully and taking steps to isolate them as necessary.  We have a highly educated and trained staff that is acutely aware of the risks posed by the pandemic.  We are also providing a level of medical care to the detainees/inmates that they are unlikely to receive outside of PCCF.

Ex. B ¶ 21.

Accordingly, for both of the above reasons—(1) that Petitioner lacks injury in fact, and (2) that the alleged injury is not redressable by release—the Alvarado Petition must be denied for lack of standing. *Spokeo, Inc.*, 136 S. Ct. at 1548; *Steel*, 523 U.S. at 102-03*; Lujan*, 504 U.S. at 560.

## II.   THE ALVARADO PETITION MUST BE DENIED BECAUSE PETITIONER DOES NOT STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

Even if the Court were to find that Petitioner has standing (and he does not), the relief he seeks is unavailable.   Petitioner seeks "a Writ of Habeas Corpus or other suitable order for injunctive relief" resulting in his "immediate release, with appropriate conditions and precautionary public health measures."   Doc. # 8 at p.18 (paragraph "b" in the prayer for relief). In the meantime, while the Court is considering that issue, Petitioner seeks preliminary relief in the form of his "immediate interim release pending the Court's consideration and resolution of this matter."   *Id.* (paragraph "a" in the prayer for relief).   Based on the particular facts of this case, neither form of relief is available.

### A.   Release As A Final Remedy Is Not Warranted Because Because Petitioner Has Not Demonstrated A Violation Of The Fifth Amendment.

When the government detains a person pursuant to an immigration violation, that person is a civil detainee. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).   To evaluate the constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).   Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to a legitimate governmental objective." *Id.* at 539; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose").   In addition, "when the State takes a person into its custody and holds him there against

his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).

Petitioner does not allege an express intent to punish him. *See generally* Doc. # 8. Nor can he dispute that preventing detained aliens from absconding, from harming the public, and ensuring that they appear for removal proceedings and their actual removal is a legitimate governmental objective. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas v. Davis*, 533 U.S. at 690-91. Thus, Petitioner may succeed on his Fifth Amendment claim only if his confinement is not reasonably related to a legitimate governmental objective or is excessive in relation to the legitimate governmental objective, *see Kingsley*, 135 S. Ct. at 2473-74, or if Respondent fails to provide for his reasonable safety, *see DeShaney*, 489 U.S. at 200.

Here, Petitioner has not made that showing and cannot do so as circumstances currently stand at PCCF. As described in the attached declarations, PCCF is taking active and substantial measures to respond to a challenging public health crisis, *including giving Petitioner his own cell*. Ex. A; Ex. B; Ex. C. Those measures create conditions that are reasonably related and not excessive in relation to the government's interests in preventing flight and protecting public safety—especially when:

- Petitioner himself is subject to mandatory detention under 8 U.S.C. § 1226(c), Ex. D at pp. 8-9;

- ICE believes he is a public safety risk on account of his drug violation and a flight risk based upon his order of removal and failure to seek any relief from removal before the immigration court, *id.*; and

- Petitioner's own healthcare providers attest that his "asthma does not put him at increased risk to COVID-19." Ex. F; Ex. G.

Moreover, PCCF's measures generally track the recommendations of public health authorities, including the CDC.  Ex. A; Ex. B; Ex. C.

Of course, the risk of contracting COVID-19, either in PCCF or elsewhere, cannot be entirely eliminated.  But Respondent is not required to eliminate any risk to Petitioner.  Rather, Respondent is required to provide for his reasonable safety.  *See DeSahney*, 489 U.S. at 200.  Because PCCF's measures meet that standard, Petitioner's claim under the Fifth Amendment fails.[8]  *E.g.*, *Kingsley*, 135 S. Ct. at 2473; *DeShaney*, 489 U.S. at 199; *Bell*, 441 U.S. at 535.

**B.     The Court Lacks Authority To Grant Interim Release To A Habeas Petitioner Who Is Subject To Mandatory Detention Under § 1226(c).**

Petitioner requests immediate release as a preliminmary remedy under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001).  Doc. # 8 ¶¶ 52-53.  His reliance on *Mapp* is fundamentally misplaced. *Mapp*, decided in 2001, was a pre-REAL ID Act case where an alien had challenged his deportation proceedings, but not the validity of his detention, through a district court habeas petition.  "The Real ID Act repealed the use of habeas petitions to challenge orders of removal; petitions for review filed in the courts of appeals are now the exclusive procedural vehicle for seeking review of such orders."  *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007).  "The core desideratum of the Real ID Act was to 'restor[e] uniformity and order to the law[.]'"  *Id.* (quoting H.R. Rep. No. 109-72, at 174 (2005)); *see also Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005) (describing the Real ID Act's jurisdictional modifications as "an effort to streamline

---

[8] For the Court's convenience, Respondent has prepared a compendium of decisions, most of which are unpublished, that reach the same or a similar result in cases seeking similar relief. *See* Compendium of Decisions, attached as <u>Exhibit I</u> hereto.  Although all of those decisions will aid the Court as it considers these issues, Respondent points the Court in particular to the district court's recent decision in *Ramsundar v. Wolf*, No. 20-42 (W.D.N.Y. Apr. 9, 2020), which found no due process violation because each of the petitioners with underlying conditions had his own cell, as all Petitioners do here (whether or not they have an underlying condition).  The *Ramsundar* decision may be found on page 271 of Exhibit I.

what the Congress saw as uncertain and piecemeal review of orders of removal, divided between the district courts (habeas corpus) and the courts of appeals (petitions for review)").

*Mapp* expressly did not address whether aliens subject to § 1226(c) detention could be granted bail pending habeas review. *Mapp*, 241 F.3d at 228 n.10.  In discussing the scope of the district court's authority to release aliens on bail during the pendency of habeas proceedings, the Second Circuit explained that, "in some cases, detention without bail is a necessary feature of our deportation procedures," and in such circumstances, "the burden lies on the political branches explicitly to instantiate such a system of detention, and to do so through the law." *Id.* at 227. Congress did exactly that in § 1226(c): "§ 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings '*only if*' the alien is released for witness protection purposes." *Jennings*, 138 S. Ct. at 847 (emphasis supplied).

In § 1226(c), Congress enacted a "specific statutory provision[]" that expressly requires mandatory detention, *i.e.*, § 1226(c), and that provision specifies only one circumstance in which an alien detained under that section may be released before the conclusion of removal proceedings—namely, only for witness-protection purposes. 8 U.S.C. § 1226(c)(2); *Jennings*, 138 S. Ct. at 847.  As the Supreme Court recognized, "§ 1226(c) makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.' §1226(a)." *Jennings*, 138 S. Ct. at 846.

Accordingly, because Petitioner is subject to § 1226(c) detention, this Court lacks authority to grant him interim release under *Mapp*. *See, e.g.*, 8 U.S.C. § 1226(c); *Jennings*, 138 S. Ct. at 846-47.[9]

---

[9] Petitioner relies on *Savino*, 2020 WL 1703844, at *9, and *Jimenez v. Wolf*, No. 18-10225 (D. Mass. Mar. 26, 2020) (Doc. # 8-1), where two other sessions of this Court granted interim release under *Mapp*.  Doc. # 8 ¶¶ 52-53.  But neither of those decisions cited the Supreme Court's

**III.    ALTERNATIVELLY, THE ALVARADO PETITION SHOULD
            BE SEVERED AND TRANSFERRED TO JUDGE SARIS.**

Alternatively, if the Court does not dismiss the Alvarado Petition for lack or standing or failure to state a claim (and it should), Respondent requests that this Court sever Petitioner from this case and transfer his petition to Judge Saris, who has been presiding over his other habeas case since February 2020.  *See Alvarado v. Moniz*, No. 20-10309-PBS (D. Mass.).  District courts have authority to sever petitioners from multi-petitioner habeas cases where, as here, the factual questions surrounding a particular petitioner's request for relief require individualized analysis (*i.e.*, Petitioner's detention authority, his public safety and flights risks, and his underlying health condition).[10]  Moreover, two pending habeas proceedings before two different judges in the same district raises concerns about judicial economy and the potential for confusion and conflicting orders.  Because Petitioner's first case has been pending with Judge Saris for over two months, the Alvarado Petition should be transferred to *Alvarado v. Moniz*, No. 20-10309-PBS (D. Mass.).

**CONCLUSION**

For all of the foregoing reasons, Respondent respectfully requests that the Court deny the Alvarado Petition and dismiss him from the case.  Alternatively, Respondent respectfully requests that the Court sever Petitioner from this case and transfer the Alvarado Petition to *Alvarado v. Moniz*, No. 20-10309-PBS (D. Mass.).

Respectfully submitted,

ANDREW E. LELLING,

---

opinion in *Jennings* nor grappled with whether a habeas petitioner, after *Jennings*, may extrapolate and apply the holding in *Mapp* to a case, like this one, involving § 1226(c) detention.  For the reasons described in text above, Respondent submits that Petitioner may not do so.

[10] *E.g.*, *Coughlin v. Rogers*, 130 F.3d 1348, 1351–52 (9th Cir. 1997), cited by *Cruz v. Bristol-Myers Squibb Co., PR*, 699 F.3d 563, 568–69 (1st Cir. 2012), and *Alston v. Town of Brookline, Massachusetts*, No. 15-13987, 2016 WL 5745091, at *11–14 (D. Mass. Sept. 30, 2016).

United States Attorney

By:   */s/ Jason C. Weida*
        Jason C. Weida
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston, Massachusetts  02210
        (617) 748-3180
Dated:  April 15, 2020        Jason.Weida@usdoj.gov