**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |
|---|---|
| WILMER RUBEN ESPINAL ALVARADO, | ) ) ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )  C.A. No. 20-10685-ADB |
| | ) |
| ANTONE MONIZ, Superintendent of the Plymouth County Correctional Facility, | ) ) |
| | ) |
| Respondent. | ) |

_____

### OPPOSITION TO RESPONDENT'S MOTION TO DENY HABEAS PETITION AND MOTION TO DISMISS

There is no dispute that COVID-19 is spreading rapidly throughout the Massachusetts incarceration system.  In the last two weeks, infections in the Department of Correction (the "DOC") have more than <u>doubled</u>.  Two county Houses of Correction—Middlesex and Essex— are reporting the same.  Since this amended petition was filed, three more DOC prisoners have died.  People living in communal living facilities—including jails and prisons—simply are not safe during the COVID-19 pandemic.  The risk is particularly acute for medically vulnerable people like Mr. Espinal Alvarado.

COVID-19 has been detected at the Plymouth County Correctional Facility (the "PCCF").  There is no dispute that one of its staff tested positive for the disease.  The respondent asserts, however, that the PCCF will be spared from this pandemic because it has implemented certain measures to mitigate the risks.  Risk mitigation should, of course, be encouraged. However, no expert has opined that the PCCF's present mitigation steps, without more, will

create reasonable safety for medically vulnerable people within that facility.  Dr. Greifinger, a medical expert who advises the Departments of Justice and Homeland Security on matters of prison health and safety, opines that they do not.  And Dr. Greifinger's conclusion is amply supported—there is no dispute that immigration detainees, like Mr. Espinal Alvarado, still live, eat, and bathe in a communal setting.

Respondent nevertheless argues that the mitigation measures must be working because none of the prisoners in the PCCF have tested positive for COVID-19.  But that proves nothing. The PCCF is not regularly administering any such tests.  Since this pandemic began, the PCCF has tested no more than eight out of 731 prisoners, which is roughly 1% of its incarcerated population.  In the last two weeks, the PCCF tested only three prisoners and two staff members. Given that COVID-19 can be carried and spread by asymptomatic people, and that many infected people will never manifest symptoms severe enough to trigger the PCCF's narrow testing protocol, the PCCF's claim of "no positive tests" says nothing about how widespread COVID-19 may actually be within the facility.

Mr. Espinal Alvarado must avoid COVID-19 infection because there is a high risk it would kill him.  Like many other petitioners in this case, he has an urgent medical need to be released to a location where he can safely self-isolate and avoid infection.  Mr. Espinal Alvarado is a civil immigration detainee.  He has no criminal record.  There has been no final decision whether he will be allowed to remain in the United States.  He is engaged to a U.S. citizen, with whom he has a 5-year-old U.S. citizen daughter.  He has an established residence with his family in Manchester, New Hampshire.  The Court can and should order his immediate release to self-isolate at home, under whatever conditions the Court deems appropriate.

## FACTS

**I.      COVID-19 is a deadly pandemic caused by a highly contagious virus.**

As the Court is no doubt aware, COVID-19 is a pandemic infection caused by the novel coronavirus SARS-COV-2.  *See* Golob Decl. ¶2.  In the United States alone, there are nearly a million confirmed COVID-19 infections, resulting in nearly 50,000 deaths.[1]  *See* Superseding Greifinger Decl. ¶4.  The fatality rate for this infection is at least 10 times higher than a severe seasonal influenza, even where patients have access to advanced healthcare facilities.  *See* Golob Decl. ¶4; Peeler Decl. ¶8.  And even patients who do not die may nevertheless suffer severe illness, resulting prolonged hospitalization, invasive medical interventions, and lasting damage to the brain, lungs, and other organs.  *See* Golob Decl. ¶¶4-5, 9; Peeler Decl. ¶¶10–11.

Although everyone is at risk from this disease, older patients and those with underlying medical conditions are most likely to suffer serious illness or death.  *See* Golob Decl. ¶3; Super. Greifinger Decl. ¶7; Peeler Decl. ¶8.  The medical conditions triggering vulnerability include lung disease, asthma, heart disease, diabetes, compromised immune system, blood and metabolic disorders, chronic liver or kidney disease, stroke, neurological and neurodevelopmental conditions, and pregnancy.  *See* Golob Decl. ¶3; Super. Greifinger Decl. ¶8; Peeler Decl. ¶9.  In the most vulnerable populations, the case fatality rate is about 15%.  *See* Golob Decl. ¶4.

COVID-19 is "highly contagious."  Super. Greifinger Decl. ¶16.  The virus is thought to be transmitted from person to person in multiple ways, including through respiratory droplets, through contract with contaminated surfaces and objects, and through airborne transmission.  *See*

---

[1] These numbers are current as of April 23.  The numbers of infections and deaths continue to climb rapidly.  Current CDC figures are available at: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

Peeler Decl. ¶7; Super. Greifinger Decl. ¶30.  The virus can be transmitted by people before they develop symptoms (*i.e.*, during the incubation period, which is typically about five days), and also by infected people who never develop symptoms.  *See* Golob Decl. ¶6; Super. Greifinger Decl. ¶5; Peeler Decl. ¶¶7, 11.  The virus is about twice as contagious as the flu, not only because it is efficiently transmitted from person to person, but also because it is a new pathogen to which nobody is immune.  *See* Peeler Decl. ¶8; Super. Greifinger Decl. ¶16.

There is no vaccine for COVID-19, and there is no known cure or anti-viral treatment at this time.  *See* Super. Greifinger Decl. ¶5.  The only way to mitigate COVID-19 is to use scrupulous hygiene practices (including avoiding shared objects and surfaces) and social distancing to prevent infection.  *See* Super. Greifinger Decl. ¶¶5, 9; Golob Decl. ¶10; Peeler Decl. ¶14.  For that reason, public officials have undertaken extraordinary measures, including closing schools, courts, restaurants, sports venues, and other congregate settings.  *See* Greifinger Decl. ¶9.  In Massachusetts, for example, the Governor has declared a state of emergency, ordered the closure of non-essential businesses, and prohibited gatherings of 10 or more people.[2] The Governor also advised residents to stay home and avoid unnecessary travel and activities.[3]

## II.    During the COVID-19 pandemic, communal living environments are not safe, especially for medically vulnerable people.

During the COVID-19 pandemic, communal living environments are not safe, particularly for medically vulnerable people.  *See* Greifinger ¶10-11, 16-17.  Because the virus that causes COVID-19 has a multi-day incubation period (during which the patient has no

---

[2] *See* "Order Assuring Continue Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More than 10 People" (Mar. 23, 2020), *available at* https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download.

[3] *See* https://www.mass.gov/news/governor-charlie-baker-orders-all-non-essential-businesses-to-cease-in-person-operation.

symptoms), and because it can be transmitted by asymptomatic and pre-symptomatic people, there is presently no effective procedure to "screen" arriving staff and residents to prevent the disease from being introduced into a communal living facility.  *See* Greifinger Decl. ¶16.  Once in the facility, the virus will spread rapidly as residents and staff interact with one another and with shared surfaces and objects, and possibly through airborne transmission as well.  *See* Greifinger Decl. ¶¶16-17, 30; Golob Decl. ¶12; Peeler Decl. ¶¶7, 23.  At present, there is no scientific evidence that people—particularly medically vulnerable people—can be adequately protected in such facilities.  *See* Greifinger Decl. ¶10.

Sadly, nursing homes and other long-term care facilities illustrate the inherent danger of communal living during this crisis.  *See* Greifinger Decl. ¶12.  Although such facilities are staffed by medical professional with specialized training in preventing the spread of disease, they have nevertheless been the sites of the some of the largest concentrated outbreaks of COVID-19 in the United States.  *See* Greifinger ¶12.  In Massachusetts, for example, at least 7,721 cases have been detected in 273 long-term care facilities, resulting in at least 1,205 deaths.  *See id.* ¶13.  More than 50% of all COVID-19 deaths in Massachusetts have occurred among residents of long-term care facilities.  *See id.*  Some individual facilities have reported 20, 30, and even 50 deaths among residents.  *See id.*

Similarly, COVID-19 is spreading rapidly through a different sort of communal living facility: the Massachusetts incarceration system (of which PCCF is a part).  In roughly the last three weeks (April 6 to 24), the number of DOC prisoners testing positive for COVID-19 has more than quadrupled, rising from 40 to 176.  *See* Suppl. Segal Decl. Ex. A.  Seven DOC prisoners have reportedly died.  *See id.* ¶4.  The story is similar at the county level, where, for

example, the number of positive cases in the Essex and Middlesex county sheriff's departments (prisoners and staff) has roughly doubled over the last two weeks to 63 cases each.[4]  *See id.* ¶5.

Consequently, as Dr. Greifinger explains, "emerging information paints a uniform picture that communal living facilities cannot adequately protect residents form COVID-19, particularly residents who are medically vulnerable to the disease."  *See* Super. Greifinger Decl. ¶16.  People in long-term care facilities rarely have a choice but to remain—they generally require skilled medical services that cannot be provided at home.  *See id.* ¶18.  In other words, for nursing home residents, discharge might <u>also</u> be unsafe.  *See id.*  But that is not the case for many prisoners (including civil immigration detainees), who could safely isolate at home for the duration of this pandemic.  *See id.*

### III.    Like other communal living environments, the PCCF cannot reasonably protect detainees, particularly those who are medically vulnerable.

The PCCF bears all the dangerous hallmarks of other communal living facilities.  There is no dispute that detainees are held in groups of 50 or more people, that they take meals together, that they share a common area for recreation, that they share a communal bathroom (including showers), and that they come into contact with numerous shared surfaces and objects from which infection may be transmitted.  *See* Felsen Decl. ¶4.  Correctional officers and staff rotate in and out of the unit, each potentially carrying infection from the outside world.  *See id.* ¶5.  Prisoners similarly rotate in and out of the facility as they are arrested, released, or deported, and as they go to and from court and other appointments.  *See id.*; McDonald Decl. ¶6(i).

---

[4] Additionally, nationwide, more than 300 confirmed cases have been reported in ICE detention facilities.  *See* https://www.ice.gov/coronavirus.  And the New York Times is currently tracking more than 10,000 cases in state prisons and detention facilities.  *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

Scientific modeling has concluded that, by the time a county has just two confirmed cases of COVID-19, there is a 70% likelihood of a sustained, undetected outbreak.  *See* Super. Greifinger Decl. ¶26.  Plymouth County, by contrast, has reported more than <u>3,000</u> confirmed cases.  *See id.* ¶27.  That number is currently increasing by more than 200 people per day.  *See id.*  Indeed, there is no dispute that COVID-19 has been detected within the PCCF itself, specifically that one staff member has tested positive.[5]  *See* McDonald Decl. ¶8.  Nevertheless, the PCCF largely relies on its claim that, of the "731 inmates and detainees" at the PCCF, "[n]ot one of [the prisoners] has tested positive for COVID-19."  *See* McDonald Decl. ¶7; *see also* Mem. re: Motion to Deny (D.E. 28) at 7 ("There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF."), 14 ("[T]here are zero cases of COVID-19 in the inmate and detention population . . . .").

The reality, however, is that the PCCF has no idea how quickly COVID-19 infection is spreading within its prisoner population, because the PCCF is not regularly testing that population for infection.  *See* Suppl. Segal Decl. ¶6; Super. Greifinger Decl. ¶33; Golob Decl. ¶7.  The PCCF has adopted a narrow set of criteria to trigger a COVID-19 test: a prisoner must have all three of (a) a fever, (b) another COVID-19 symptom, and (c) a negative influenza test.[6]

---

[5] To the best of counsel's knowledge, the PCCF has never provided even basic information about the staff member case.  For example, although the Baker Declaration refers to a "case worker," the staff member's specific job and place of work within the facility remain undisclosed.

[6] In contrast the PCCF's narrow criteria for testing, the Massachusetts Department of Public Health is recommending universal testing for long term care facilities, including for both symptomatic and asymptomatic residents and staff.  *See* Mass. DPH, "Mobile Testing at Long Term Care and Assisted Living Residences," *available at* https://www.mass.gov/info-details/covid-19-testing#mobile-testing-at-long-term-care-and-assisted-living-residences- ("It is recommended that if there is suspicion of COVID-19 in the building, facilities order tests for their entire building, both residents and employees."); Mass. DPH, "Massachusetts COVID-19 Nursing Home, Rest Home, and ALR Mobile Testing Program, Revised Guidance: April 13,

*See* Super. Greifinger Decl. ¶33; Baker Decl. ¶10.  Although the PCCF does not explain when

that protocol was adopted, it is undisputed that, out of 731 prisoners, the PCCF has tested only

<u>eight</u> since this pandemic began.  *See* Suppl. Segal Decl. ¶6.  In the last two weeks, the PCCF

has conducted a grand total of <u>five</u> tests—two for staff and three for prisoners.  *See id.*  Given the

prevalence of asymptomatic and mildly symptomatic infection, the PCCF cannot draw any

reliable conclusions by testing a miniscule fraction of its population.  *See* Golob Decl. ¶7 ("A

lack of proven cases of COVID-19 in the context of a lack of testing is functionally meaningless

for determining if there is a risk for COVID-19 transmission in a community or institution.");

Super. Greifinger Decl. ¶33 ("The facility cannot draw any reliable conclusions about the spread

of COVID-19 within its wall by testing approximately one percent of its incarcerated population,

particularly given the large number of infected people who (because they are asymptomatic or

mildly symptomatic) will not meet the PCCF's very narrow criteria for testing.").[7]

---

2020," available at same website as prior citation ("It is recommended that you order tests for all
residents and staff, NOT just symptomatic individuals.").

[7] Prison facilities that initiate mass testing for COVID-19 are finding rampant infection, much of
it spreading among people who are presently asymptomatic. *See, e.g.*, Cary Aspinwall & Joseph
Neff, "*These prisons are doing mass testing for COVID-19—and finding mass infections*," The
Marshall Project (Apr. 24, 2020) (reporting, for example, that mass testing at two Ohio facilities
uncovered in 3,500 infections among prisoners, and that mass testing at a prison in North
Carolina found that 65% percent of prisoners were positive and nearly all of them were presently
asymptomatic).

Similarly, recent studies have revealed that inadequate testing in communal living environments
can cause dramatic undercounting of positive cases of COVID-19.  For example, the Broad
Institute of MIT and Harvard recently launched a program to conduct COVID-19 testing of all
residents and staff members at the city of Cambridge's skilled nursing facilities and assisted
living facilities.   In the first four days of the program, about a thousand people were tested, and
200 were found to be positive for COVID-19.  Previously, Cambridge officials were aware of
only 24 cases.  *See* Broad Institute, Broad Institute partners with City of Cambridge to pilot
COVID-19 surveillance in nursing facilities (Apr. 16, 2020),

The PCCF has also adopted certain mitigation strategies, including housing detainees in Mr. Espinal Alvarado's unit in a one-person-per-cell arrangement, providing masks (although these obviously cannot be worn while detainees eat together), and staggering access to the common area (such that about 30 detainees would be in the common areas of Mr. Espinal Alvarado's unit at a given time). *See* McDonald Decl. ¶¶6, 9. To be clear, such mitigation measures should be encouraged. However, tellingly, no medical expert has opined that these measures actually provide reasonable safety from COVID-19 for a communal living facility like the PCCF. To the contrary, Dr. Greifinger has reviewed the PCCF's measures (and related measures adopted by ICE on April 10), and concluded that detainees remain "in imminent danger of serious illness and death." *See* Super. Greifinger Decl. ¶25. As Dr. Greifinger explains, these measures are not sufficient to stop the disease from entering the PCCF, nor are detainees within the PCCF in a position to avoid infection. *See id.* ¶¶25-35. The release of detainees, particularly those with medical vulnerabilities, is necessary. *See id.* ¶¶35-37.

## IV.     Like other detainees at the PCCF, Mr. Espinal Alvarado is medically vulnerable and can be safely released.

The respondent has filed a "Compendium of Summaries" regarding the 60+ petitioners in this case. *See* Compendium (D.E. 28-4). However, this document does not purport to be "an exhaustive review," and it is clear that important information is not included. For example, the compendium does not include any petitioner's age (even though being older is a key COVID-19 risk factor). It does not state whether any petitioner has been tested for COVID-19 or what the

---

https://www.broadinstitute.org/news/broad-institute-partners-city-cambridge-pilot-covid-19-surveillance-nursing-facilities.

results were.  It provides no medical information at all concerning 25 petitioners, and, for the

remainder, the medical data appears to be drawn from arrest records rather than the PCCF's

actual medical files.  Nevertheless, even in its present state, the compendium makes clear that

some of the petitioners are medically vulnerable, including due to diabetes and high blood

pressure.  It also makes clear that very few, if any, of the petitioners have ever been convicted of

violent crimes.

The compendium and the accompanying Wesling Declaration certainly do not tell the

complete story regarding Mr. Espinal Alvarado.  Mr. Espinal Alvarado has been present in the

United States approximately 10 years.  *See* Church Decl. ¶3.  He resides in Manchester, New

Hampshire, with his fiancé and 5-year-old daughter, both of whom are U.S. citizens.  *See id.*;

Santiago Decl. ¶¶1-3.  He has no criminal record.  *See* Church Decl. ¶6; Suppl. Church Decl.

¶¶8-9 & Ex. B.  He is potentially eligible to remain in the United States due to his engagement to

a United States citizen.  *See* Suppl. Church Decl. ¶¶4-5.  That relief was to be addressed at a

hearing last December, but his attorney suffered a complication in her pregnancy and became

unavailable due to the early birth of her baby.  *See id.* ¶¶6-7.  The Immigration Judge denied a

motion to continue that hearing, cancelled it, and then summarily ordered Mr. Espinal Alvarado

deported.  *See id.*  That action is currently being appealed.  *See id.*

The respondent does not appear to dispute that Mr. Espinal Alvarado has asthma, that he

reported his history of asthma shortly after arrest during his "Initial Physical Health

Assessment," that he recently reported difficulty breathing, and that a PCCF physician prescribed

him medication in response to that report.  *See* PCCF Medical Records (filed under seal) at 7,

12-13.  Nurse Marcia Norat asserts that "the asthma does not put [Mr. Espinal Alvarado] at

increased risk to COVID-19."  Norat Decl. ¶8.  However, Dr. Katherine Peeler, a critical care

physician at Boston Children's Hospital and instructor at Harvard Medical School, has examined the medical records produced by the respondent and concludes that "Mr. Espinal Alvarado falls into [the] group of high risk individuals" for COVID-19.  *See* Peeler Decl. ¶36.

## ARGUMENT

### I.      Mr. Espinal Alvarado and the other petitioners have standing.

Mr. Espinal Alvarado and the other petitioners are presently being held in a facility that cannot protect them from a pandemic disease that may cause severe illness, organ damage, and death.  Nevertheless, the respondent argues that Mr. Espinal Alvarado has no standing to challenge his predicament.  The respondent is wrong.  Mr. Espinal Alvarado has shown a particularized and imminent harm that is traceable to the respondent's detention of him, and that would be redressed through habeas relief.  *See Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 330 (1st Cir. 2020).  The Court should reject the respondent's arguments, as the court did recently in the *Savino v. Hodgson* class action addressing similar claims by detainees in Bristol County.  *See* No. 20-10617, 2020 WL 1703844, at *4 (D. Mass. Apr. 8, 2020).

####      a.   Mr. Espinal Alvarado has standing to protect himself from imminent harm.

The respondent argues that Mr. Espinal Alvarado's alleged injury is insufficiently imminent.  Yet, to establish standing, "a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about.'"  *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 225 (1st Cir. 2019).  Likely results that are "predictable" are sufficient.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019).

Here, as the court noted in *Savino*, "[i]n this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that the Detainees face no 'substantial risk' of harm (if not 'certainly impending') from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe."  *See*

*Savino*, 2020 WL 1703844, at \*4.[8]  The respondent's assertion that the PCCF has detected no infections in the prisoner population proves nothing, given that the PCCF has tested only a miniscule fraction of that population and, under its own protocol, will <u>never</u> test people who are mildly symptomatic, asymptomatic, or pre-symptomatic.  *See* Golob Decl. ¶7; Super. Greifinger Decl. ¶33; *see also Fraihat v. U.S. Immigration & Customs Enf't*, No. 19-1546, 2020 WL 1932570, at \*21 (C.D. Cal. Apr. 20, 2020) ("Even if no detainee or staff member had tested positive . . . the Court rejects the contention that the risk of COVID-19 is overly speculative."); *Coreas*, 2020 WL 1663133, at \*6 ("[I]t is impossible to point to any confirmed cases . . . when Respondents have no conducted any COVID-19 tests at those facilities . . .").  Similarly, the respondent points to PCCF's mitigation measures, but, as explained above, these steps have not made detention safe for Mr. Espinal Alvarado or the other detainees.  *See* Super. Greifinger Decl. ¶¶25-37.  Lastly, there is abundant evidence that COVID-19 is dangerous for <u>everyone</u>, and also that (contrary to the respondent's assertions) it is particularly dangerous for Mr. Espinal Alvarado due to his medical vulnerability.  *See* Peeler Decl. ¶36.  The fundamental fact is that COVID-19 is moving rapidly and inexorably through the Massachusetts incarceration system and has been detected in the PCCF.  The Court should not require Mr. Espinal Alvarado to delay acting for his own protection until he is already infected with this incurable and potentially fatal disease.

---

[8] Although Respondent attempts to distinguish *Savino* as factually incomparable given the differing numbers of detainees between BCHOC and PCCF, numerous other courts have also rejected the same standing arguments (on both the injury-in-fact and redressability prongs) that the government now raises.  *See, e.g.*, *Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at \*8 (E.D. Mich. Apr. 15, 2020); *Bent v. Barr*,No. 19-cv-06123-DMR, 2020 WL 1812850, at \*3– \*4 (N.D. Cal. Apr. 9, 2020); *Rafael L.O. v. Tsoukaris*, No. 20-3481 (JMV), 2020 WL 1808843, at \*6 (D.N.J. Apr. 9, 2020); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1704324, at \*8 (W.D. Wash. Apr. 8, 2020); *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at \*5– \*6 (D. Md. Apr. 3, 2020); *Thakker v. Doll*, _ F. Supp. 3d _, 2020 WL 1671563, at \*2 (M.D. Pa. Mar. 31, 2020).

      b.   *Mr. Espinal Alvarado has standing because habeas relief would redress his injury by allowing him to safely isolate at home.*

The respondent also argues that Mr. Espinal Alvarado would be no better off if released. That is clearly not correct.  As explained above, people in communal living environments are inherently at much higher risk of contracting COVID-19 precisely because they cannot isolate themselves from others, which is the principle mitigation strategy to avoid this disease. Greifinger Decl. ¶¶16-17, 30; Golob Decl. ¶12; Peeler Decl. ¶14.  In contrast, if Mr. Espinal Alvarado were released, he would self-isolate at his home in Manchester, New Hampshire, exactly as public health officials recommend.  *See* Santiago Decl. ¶11.  Additionally, Mr. Espinal Alvarado would (contrary to the respondent's assertions) have health care access upon release through his fiancé's health plan.  *See id.* ¶5.  For all these reasons, Mr. Espinal Alvarado's injury is redressable exactly, and exclusively, through the remedy of release that he has claimed.  *See Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978); *Savino*, 2020 WL 1703844, at *4 ("This risk of injury is traceable to the government's act of confining the Detainees in close quarters and would of course be redressable by a judicial order of release or other ameliorative relief."); *Coreas*, 2020 WL 1663133, at *6 (finding release from detention would redress COVID-19 risk and noting "the absurdity of the claim that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty").

## II.    Due Process principles require that Mr. Espinal Alvarado be released.

Under the Due Process Clause, pretrial and civil detainees like Mr. Espinal Alvarado may not be subject to conditions that amount to punishment, including conditions that do not "reasonably relate[] to a legitimate governmental objective."  *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *accord Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988).  Accordingly, the First Circuit has found that, at a minimum, detention conditions are unconstitutional where they:

(1) objectively deny a minimal measure of necessities required for civilized living; and (2) are imposed with deliberate indifference to inmate health or safety. *Surprenant v. Rivas*, 424 F.3d 5, 18–19 (1st Cir. 2005); *Reaves v. Dep't of Corr.*, 333 F. Supp. 3d 18, 26 (D. Mass. 2018); *Couchon v. Cousins*, No. 17-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018).   In other words, due process "provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007); *accord Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990).

However, even where conditions do not amount to "deliberate indifference," pretrial and civil detainees are also protected from treatment that is objectively unreasonable. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 350–51 (7th Cir. 2018) ("In conducting this borrowing exercise, we have grafted the Eighth Amendment's deliberate indifference requirement onto the pretrial detainee situation.   Missing from this picture has been any attention to the difference that exists between the Eighth and the Fourteenth Amendment standards." (citation omitted)).   The objective unreasonableness standard originates in the Supreme Court's recent decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), a case that "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting." *Miranda*, 900 F.3d at 351. *Kingsley* held that a pretrial detainee bringing an excessive force claim need only prove that the defendant's conduct was objectively unreasonable, and not also that the defendant was subjectively aware that the amount of force used was unreasonable.  135 S. Ct. at 2472–73.

"Several circuits have since carried the *Kingsley* analysis over into conditions of confinement cases," among other constitutional claims. *Couchon*, 2018 WL 4189694, at *6; *see, e.g.*, *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019); *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017).   Accordingly, petitioners need only show that defendants "acted intentionally

to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35; *see also Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019).

Under either the objective unreasonableness or deliberate indifference standard, Mr. Espinal Alvarado has stated a claim for a Due Process violation. As the *Savino* court explained, "the virus is gravely dangerous to all of us," and that harm is "more serious for some petitioners than for others." *Savino*, 2020 WL 1703844, at *7. Mr. Espinal Alvarado is at high risk of contracting a potentially fatal illness if he remains detained, and he faces a heightened risk of severe illness and death from that disease due to his medical vulnerabilities. The government is aware of these risks, and the risk can only be reasonably mitigated by release to allow self-isolation in a home setting. *See* Super. Greifinger ¶36; Peeler Decl. ¶35.

Other courts that have considered the constitutionality of similar conditions of confinement have found Fifth Amendment violations. In *Jeferson V. G. v. Decker*, for example, the District of New Jersey held that continued detention was "tantamount to punishment," and therefore likely violated the Fifth Amendment, where, as here, an asthmatic immigration detainee had to share a bathroom, common surfaces, and shower facilities with other detainees. No. CV 20-3644, 2020 WL 1873018, at *8 (D.N.J. Apr. 15, 2020); *see also Basank v. Decker*, No. 20-CV-2518, 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious."). Similarly, in *Ortuno v. Jennings*, the Northern District of California found that petitioners – including one who suffered from asthma – had made a clear showing that they were likely to succeed on the merits of their Fifth Amendment claim where they could not practice "meaningful social

distancing" in detention, including at meal times.  No. 20-CV-02064-MMC, 2020 WL 1701724, at *4 (N.D. Cal. Apr. 8, 2020).  And in *Malam v. Adducci*, the Eastern District of Michigan found that a medically vulnerable immigration detainee was likely to succeed on the merits of her Fifth Amendment claim, "in spite of precautionary measures and despite the lack of confirmed [facility] outbreak [of COVID-19] to date," where the petitioner "share[d] toilets, sinks, phones, and showers, [ate] in communal spaces, and [was] in close contact with the many other detainees and officers."  No. 20-10829, 2020 WL 1672662, at *8, *11 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020). *See also Thakker*, 2020 WL 1671563, at *8 (finding that medically vulnerable petitioners were likely to succeed on a Fifth Amendment claim where they could not practice effective social distancing or proper hygiene in detention).

The cases Respondent cites in arguing that there is no Due Process violation are readily distinguishable.  Respondent relies heavily on *Ramsundar v. Wolf*, No. 20-CV-361, 2020 WL 1809677, at *4 (W.D.N.Y. Apr. 9, 2020), to argue that a facility does not violate the Fifth Amendment if it places detainees with underlying medical conditions in their own cells.  D.E. 28 at 20 n.8.  In that case, however, the vulnerable petitioners who were housed in single cells had "accommodation to eat meals in those cells and to bathe and shower in isolation."  *Ramsundar* 2020 WL 1809677, at *4.  That type of isolation within a prison would not, in fact, be acceptable or helpful.  *See* Super. Greifinger Decl. ¶34 (explaining reasons).  But in all events, it does not exist at the PCCF, where Mr. Espinal Alvarado uses common areas shared by more 50 people to eat, live, and bathe.

Respondent further alleges that, because there is not "a single case" of COVID-19 at PCCF, Mr. Espinal Alvarado is safe.  But, as explained above, the PCCF cannot presently draw any reliable conclusions about whether or not COVID-19 is spreading in the facility.  As the

Central District of California noted, "[t]he Government, here, cannot say, with any degree of certainty, that [someone at the facility] has not been, or will not be, infected with the coronavirus" because "infected, asymptomatic carriers of the coronavirus are highly contagious." *Hernandez v. Wolf*, 20-cv-617, Dkt. No. 17, at *11 (C.D. Cal., Apr. 1, 2020). The lack of widespread testing is yet another reason that the PCCF is unsafe.

Lastly, to the extent relevant, it also clear that there are substitute measures that can achieve community safety and Mr. Espinal Alvarado's future appearance, absent continued detention. The Court could order, for example, home confinement, GPS monitoring, and other conditions that the Court deems appropriate. But in all events, because the government has actual knowledge of the impending, preventable, and extreme risks that COVID-19 poses to Mr. Espinal Alvarado (including death), his release is required under due process principles.

### III.   Under cases like *Mapp v. Reno*, the Court can order Mr. Espinal Alvarado and other detainees released to safety while it considers their claims.

The respondent argues that the REAL ID Act divests this Court of jurisdiction to release Mr. Espinal Alvarado pursuant to *Mapp v. Reno*, but this assertion is not correct. Even if Mr. Espinal Alvarado's non-criminal "violation" triggered mandatory detention under 8 U.S.C. §1226(c) (which it does not), the REAL ID Act did not divest the District Courts of jurisdiction to hear challenges to such detention. *See Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) ("[W]e have held that district court retain jurisdiction over challenges to the legality of detention in the immigration context."); *Elkimya v. DHS*, 484 F.3d 151, 153 (2d Cir. 2007) (holding REAL ID Act "did not qualify [the courts'] inherent authority to admit to bail petitioners in immigration cases"); *see also Reid v. Donelan*, 390 F. Supp. 3d 201, 227-28 (D. Mass. 2019) (resolving class action raising constitutional challenges to mandatory detention).

Similarly, the respondent argues that *Mapp* cannot be applied to mandatory detainees. This is also not the case.  The current mandatory detention statute for pre-final order detainees, 8 U.S.C. §1226(c), was enacted in 1996.  *See Nielsen v. Preap*, 139 S. Ct. 954, 968 (2019).  *Mapp* was decided five years later in 2001.  *See generally* 241 F.3d 221 (2d Cir. 2001).  The court in *Mapp* did not have occasion to specifically address the applicability of its holding to §1226(c) detainees, because the government withdrew its prior assertion that the petitioner was subject to that statute.  *See* 241 F.3d at 228.  However, courts subsequently have found that the courts' power of interim release articulated in *Mapp* applies equally to §1226(c) detainees.  *See, e.g.*, *Jovel v. Decker*, No. 20-308, 2020 WL 1502038, at *4 (S.D.N.Y. Mar. 24, 2020) (report and recommendation), *adopted by* 2020 WL 1539282 (S.D.N.Y. Mar. 31, 2020).  Here, as explained in the Amended Petition, there are extraordinary circumstances justifying interim release while Mr. Espinal Alvarado's petition is considered.  *See* Am. Pet. ¶¶52-54; *see also Savino*, 2020 WL 1703844, at *8-9; Mar. 26, 2020 Order, *Calderon Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass.) (Ex. A to Amended Petition).

## IV.    The Court has jurisdiction and authority to order the release of Mr. Espinal Alvarado and other detainees as a final remedy.

"[H]abeas corpus is, at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), and "[f]ederal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights."  *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992).  As a result, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population."  *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also* 28 U.S.C. § 2243; *Boumediene v. Bush*, 553 U.S. 723, 779-80 (2008) (explaining that "common-law habeas corpus was, above all an adaptable remedy," that the "habeas court's role was most extensive in cases of pretrial

and noncriminal detention," and that "when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority . . . to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release").

Courts have regularly exercised this authority to remedy constitutional violations caused by overcrowding.  *See, e.g.*, *Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).  The same principle applies here.  As the constitutional principles and public health experts make clear, releasing Mr. Espinal Alvarado and other detainees on conditions is the only viable remedy to ensure their safety, and falls well within the Court's habeas jurisdiction and authority.  *See, e.g.*, *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, (1st Cir. 2010) (habeas appropriate to seek release or "quantum change in the level of custody").

**V.     Mr. Espinal Alvarado's case should not be transferred, because the case before Judge Saris is already resolved and was, in all events, distinct from the claim presented in this action.**

The respondent argues that Mr. Espinal Alvarado's petition should be severed and transferred to Judge Saris, who is presiding over the separate habeas petition *Espinal Alvarado v. Moniz*, C.A. No. 20-10309.  That separate petition claimed that Mr. Espinal Alvarado was entitled to a bond hearing in the Immigration Court (which he has never had).  On April 23, Judge Saris entered a final order allowing that petition and ordering that a bond hearing occur pursuant to the declaratory judgment in *Reid v. Donelan*, 390 F. Supp. 3d 201 (D. Mass. 2019). Counsel understand that the bond hearing is currently scheduled to occur on Tuesday, April 28. If the Immigration Judge denies bond at that hearing, then Mr. Espinal Alvarado will remain detained in the PCCF and at risk of COVID-19 infection.

Accordingly, Mr. Espinal Alvarado has no pending case before Judge Saris, and the closed case raised claims that are factually and legally distinct from this petition.  In such

circumstances, counsel respectfully submit that a transfer would not serve the interests of justice

or judicial economy, particularly where this Court will need to consider the same facts and legal

questions relating to the PCCF to resolve the other 60+ petitions in this case.  *See* Apr. 7, 2020

Order, *Savino v. Hodgson*, C.A. No. 20-10617 (denying respondent's request to transfer COVID-

19 habeas claim to petitioner's pending habeas case relating to lack of an adequate bond

hearing); *see also* D. Mass. L.R. 40.1(g)(5) & (i)(1).

**VI.    The Court can consider ordering the PCCF to produce additional information, if it would be helpful.**

Mr. Espinal Alvarado (and other detainees) should be released on the current record.

However, counsel respectfully note that the Court could require the PCCF to produce

supplemental information, to the extent it would be helpful.  For example, what are the ages and

actual medical statuses of the petitioners (as reflected in medical, not arrest, records)?  Are new

prisoners (such as arrestees and immigration detainees) still being transferred into the facility?

Since the pandemic began, how many prisoners have presented with one or more COVID-19

symptom (fever, cough, etc.) but were never tested?  Have any prisoners been released or sent to

the hospital while exhibiting symptoms of COVID-19, and, if so, did the facility later receive

their test results?  Counsel respectfully suggest that, should the Court require further factual

development, these questions may be a reasonable starting point.

## CONCLUSION

For all the foregoing reasons, and those contained in the petition and the record in this

case, Mr. Espinal Alvarado respectfully requests that his petition be allowed, and that he be

released from detention immediately to self-isolate on such conditions as the Court deems

appropriate.

Dated: April 26, 2020                          Respectfully submitted,

*/s/ Daniel L. McFadden*
Matthew R. Segal (BBO # 654489)
Daniel McFadden (BBO # 676612)
Adriana Lafaille (BBO # 680210)
Laura K. McCready (BBO # 703692)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MASSACHUSETTS, INC.
211 Congress Street
Boston, MA 02110
(617) 482-3170
msegal@aclum.org
dmcfadden@aclum.org
alafaille@aclum.org
lmccready@aclum.org

David C. Fathi (WA 24893)**
Eunice H. Cho (WA 53711)**
AMERICAN CIVIL LIBERTIES UNION FOUDATION,
NATIONAL PRISON PROJECT
915 15th St. N.W., 7th Floor
Washington, DC  20005
T: 202-548-6616
E: dfathi@aclu.org
E: echo@aclu.org

Michael K. T. Tan*
Anand V. Balakrishnan*
Rebecca A. Ojserkis*
Omar C. Jadwat*
ACLU FOUNDATION IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Tel: 212-549-2660
mtan@aclu.org
abalakrishnan@aclu.org
rojserkis@aclu.org
ojadwat@aclu.org

Sarah Sherman-Stokes (BBO# 682322)
Associate Director
IMMIGRANTS' RIGHTS AND HUMAN TRAFFICKING
PROGRAM
BOSTON UNIVERSITY SCHOOL OF LAW
765 Commonwealth Avenue

Room 1302F
Boston, MA 02215
T. 617-358-6272
sstokes@bu.edu

Susan B. Church (BBO# 639306)
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 01
Cambridge, MA 02139
Tel. (617) 354-3944
sbc@demissiechurch.com

Kerry E. Doyle (BBO# 565648)
GRAVES & DOYLE
100 State Street, 9th Floor
Boston, MA 02109
(617) 542-6400
kdoyle@gravesanddoyle.com