## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
Rogerio Pereira Da Silva;                   )    Case No.: 1:20-cv-10685-ADB
Jose Victor Hernandez Mendez; and           )
Filipe De Liman Moura Barros;               )
                                            )
                 Petitioners,               )
                                            )
        v.                                  )
                                            )
ANTONE MONIZ, Superintendent of the Plymouth)
County Correctional Facility; JOSEPH D.     )
MCDONALD, Jr., Sheriff of Plymouth County; and)
TODD LYONS, Acting Field Office Director, U.S. )
Immigration and Customs Enforcement.        )
                                            )
                 Respondents                )
_____)


## OPPOSITION TO THE RESPONDENT'S MOTION TO DENY
## AND MOTION TO DISMISS


While the COVID-19 pandemic spreads, individuals held in custody face grave dangers that affect their very lives.  Infections in Department of Corrections (DOC) facilities have doubled in the last two weeks.  Communal living facilities such as prisons and jails are not safe during the pandemic.  Older individuals with medical problems like the petitioners face increased risk from COVID-19.

COVID-19 had been detected at the Plymouth County Correctional Facility (PCCF) where the petitioners are being held.  It is a fact that a staff member at this facility tested positive for the disease.  The respondent states that PCCF will be spared because it has implemented certain ameliorative measures to lessen the risk.  Nevertheless, no expert has given his

professional opinion on the PCCF's currently mitigation plan will establish a medically safe environment for medically vulnerable people in the facility.  According to Dr. Greifinger, a medical expert who advises the Department of Justice and Homeland Security on matters of health and safety, there is no scientific evidence that a particular layout or spacing will make communal living in a facility safe from COVID-19.   And there are aspects of life in detention that remain unavoidably communal such as bathing and the taking of meals.  And this is the sort of environment the petitioners find themselves in.

## FACTS

**1.         COVID-19 is a deadly pandemic caused by a highly contagious virus**

As the Court is no doubt aware, COVID-19 is a pandemic caused by the novel coronavirus SARS-COV-2.  See Golob Decl. ¶ 2.  In the United States alone, there are nearly a million confirmed COVID-19 infections, resulting in nearly 50,000 deaths.  See Greifinger Decl. .¶ 4.  The fatality rate for this infection is at least ten times higher that a severe seasonal influenza, even where patients have access to advanced healthcare facilities.  See Golub Decl. ¶ 4. And even patients who do not die may nevertheless suffer severe illness, resulting in prolonged hospitalization, invasive medical interventions, and lasting damage to the brains, lungs, and other organs.  See Golub Decl.  ¶ 4.

Although everyone is at risk from this disease, older patients and those with underlying medical conditions are most likely to suffer serious illness or death.  See Golub Decl. ¶ 3, Super. Greifinger Decl. ¶ 8.  The medical conditions triggering vulnerability include lung disease, asthma, heart disease, diabetes, compromised immune system, blood and metabolic disorders,

chronic liver or kidney disease, stroke, neurological and neurodevelopmental conditions and pregnancy.  See Golob Decl. ¶ 3, Greifinger Decl. ¶ 8.  In the most vulnerable populations, the case fatality rate is 15%.  See Golob Decl.  ¶ 4.

COVID-19 is "highly contagious."  Super. Greifinger Decl. ¶ 16.  The virus is thought to be transmitted from person to person in multiple ways, including through respiratory droplets, through contact with contaminated surfaces and objects, and through airborne transmission. Super. Greifinger Decl. ¶ 30.  The virus can be transmitted by people before they can develop symptoms (i.e., during the incubation period, which is typically about five days), and also by infected people who never develop symptoms.  See Golob Decl. ¶ 6, Super. Greifinger Decl. ¶ 5. The virus is about twice as contagious as the flu, not only because it is efficiently transmitted from person to person, but also because it is a new pathogen to which nobody is immunes.  See Super. Greifinger Decl. ¶ 16.

There is no vaccine for COVID-19, and there is no know cure or anti-viral treatment at this time.  See Super. Greifinger Decl. ¶ 5.  The only way to mitigate COVID-19 is to use scrupulous hygiene practices (including avoiding shared objects and surfaces) and social distancing to prevent infection.  See Super Greifinger Decl. ¶¶ 5, 9; Golob Decl. ¶ 10.  For that reason, public officials have undertaken extraordinary measures, including closing schools, courts, restaurants, sports venues, and other congregate settings.  See Greifinger Decl.  ¶ 9.  In Massachusetts, for example, the Governor has declared a state of emergency, ordered the closure of non-essential businesses, and prohibited gatherings of 10 people or more.  The Governor also advised residents to stay at home and avoid unnecessary travel and activities.

## II.    During the COVID-19 pandemic, communal living environments are not safe, especially for medically vulnerable people

During the COVID-19 pandemic, communal living environments are not safe, particularly for medically vulnerable people.  <u>See</u> Greifinger Decl. ¶¶  10-11, 16-17.  Because the virus that causes COVID-19 has a multi-day incubation period (during which the patient has no symptoms), and because it can be transmitted by asymptomatic and pre-symptomatic people, there is presently no effective procedure to "screen" arriving staff and residents to prevent the disease from being introduced into a communal living facility.  <u>See</u> Greifinger Decl. ¶ 16.  Once in the facility, the virus will spread rapidly as residents and staff interact with one another and with shared surfaces and objects, and possibly through airborn transmission as well. <u>See</u> Greifinger Decl. ¶¶ 16-17; Golob Decl. ¶ 12.  At present, there is no scientific evidence that people – particularly medically vulnerable people – can be adequately protected in such facilities.  <u>See</u> Greifinger Decl.   ¶ 10.

Sadly, nursing homes and other long-term care facilities illustrate the inherent danger of communal living during the crisis.  <u>See</u> Greifinger Decl. ¶ 10.  Although such facilities are staffed by medical professionals with specialized training in preventing the spread of disease, they nevertheless have been the sites of some of the largest concentrated outbreaks of COVID-19 in the United States.  <u>See</u> Greifinger Decl. ¶ 12.  In Massachusetts, for example, at least 7,721 cases have been detected in 273 long-term care facilities, resulting in at least 1,205 deaths.  <u>See</u> <u>id</u>. ¶ 13.  More than 50% of all COVID-19 deaths in Massachusetts have occurred among residents of long-term care facilities.  <u>See</u> <u>id</u>.

Similarly, COVID-19 is spreading rapidly through a different sort of communal living facility:  the Massachusetts incarceration system (of which PCCF is a part).  In roughly the last three weeks, the number of DOC prisoners testing positive for COVID-19 had more than quadrupled, rising from 40 to 174.  Seven DOC prisoners have reportedly died.  The story is

similar at the county level, where, for example, the number of positive cases in the Essex and Middlesex county sheriff's departments (prisoners and staff) has roughly doubled over the last two weeks to 63 cases each.

Consequently, as Dr. Greifinger explains, "emerging information paints a uniform picture that communal living facilities cannot adequately protect residents from COVID-19, particularly residents who are medically vulnerable to the disease." See Super. Greifinger Decl. ¶ 16.  People in long-term care facilities rarely have a choice but to remain – they generally require skilled medical services that cannot be provided at home.  See id. at ¶ 18.  In other words, for nursing home residents, discharge might also be unsafe.  See id.  But that is not the case for many prisoners (including civil immigration detainess), who could safely isolate at home for the duration of the pandemic.  See id.

## III.   Like other communal living environments, the PCCF cannot reasonably protect Detainees, particularly those who are medically vulnerable

The PCCF bears all the dangerous hallmarks of other communal living facilities.  There is no dispute that detainees are held in groups of 50 or more people, that they take meals together, that they share a common area for recreation, that they share a communal bathroom (including showers), and that they come into contact with numerous shared surfaces and objects from which infection may be transmitted.  Correctional officers and staff rotate in and out of the unit, each potentially carrying infection from the outside world.  Prisoners similarly rotate in and out of the facility as they are arrested, released, or deported, and as they go to and from court and other appointments.

Scientific modeling has concluded that, by the time a county has just two confirmed cases of COVID-19, there is a 70% likelihood of a sustained, undetected outbreak.  See Super.

Greifinger Decl. ¶ 26.  Plymouth County, by contrast, has reported more 3,000 confirmed cases. See id. at ¶ 27.  Indeed, there is no dispute that COVID-19 has been detected within the PCCF itself, specifically that one staff member has tested positive.  Nevertheless, the PCCF largely relies on its claim that, of the "731 inmates and detainees" at the PCCF, "[n]ot one of [the prisoners] has tested positive for COVID-19."  See Mem. Re: Motion to Deny (D.E. 28) at 7 ("There is not currently, and has never been, a case of COVID-19 in the inmate and detainee population at PCCF."), 14 ("[T]here are zero cases of COVID-19 in the inmate and detention population….").

The reality, however, is that the PCCF has no idea how quickly COVID-19 infection is spreading within its prisoner population, because the PCCF is not regularly testing that population for infection.  See Super. Greifinger Decl. ¶ 33; Golub Decl. ¶ 7.  The PCCF has adopted a narrow set of criteria to trigger a COVID-19 test: a prisoner must have all three of (a) a fever, (b) another COVID-19, and (c) a negative influenza test.  See Super. Greifinger Decl. ¶ 33. ("The facility cannot draw any reliable conclusions about the spread of COVID-19 within its wall by testing approximately one percent of its incarcerated population, particularly given the large number of infected people who (because they are asymptomatic or mildly symptomatic) will not meet the PCCF's very narrow criteria for testing.").

The PCCF has also adopted certain mitigation strategies, including housing detainees in the petitioners' unit in a one-person-per-cell arrangement, providing masks (although these obviously cannot be worn while detainees eat together), and staggering access to the common area (such that about 30 detainees would be in the common areas of the petitioners' unit at a given time."  To be clear, such mitigation measures should be encouraged.  However, tellingly, no medical expert has opined that these measures actually provide reasonable safety from

COVID-19 for a communal living facility like PCCF.  To the contrary, Dr. Greifinger has

reviewed the PCCF's measures (and related measures adopted by ICE on April 10), and

concluded that detainees remain "in imminent danger of serious illness and death."  See Super.

Greifinger Decl. ¶ 25.  As Dr. Greifinger explains, these measures are not sufficient to stop the

disease from entering the PCCF, nor are the detainees within the PCCF in a position to avoid

infection  See id. ¶¶ 25-35.  The release of detainees, particularly those with medical

vulnerabilities, is necessary,  See id. ¶¶ 35-37.

**IV.     Like other detainees at the PCCF, the petitioners are medically vulnerable and can be safely released**

Petitioner Rogerio Pereira DaSilva is a civil immigration detainee at Plymouth County.

Mr. DaSilva has a pending Appeal with the Board of Immigration Appeals (BIA).  Mr. DaSilva

has been detained at Plymouth County for 68 days as of April 29, 2020; he is 38 years old and

suffers from sinusitis, usually requiring hospitalization because it severely affects his respiratory

system.  Mr. DaSilva underwent surgery to repair a ruptured Achilles tendon that he suffered at

PCCF.  The elevated risk comes from the respiratory complications caused by his sinusitis,

weakening his respiratory system.  See Lagana Decl.

Petitioner Jose Victor Hernandez Mendez is a civil immigration detainees at Plymouth

County.  Mr. Hernandez is 44 years old and suffers from diabetes that requires two types of

medication to control.  Mr. Hernandez Mendez is on 1,000 mg of Metformin and 100 units/ml

per day of Lantus insulin injections.  The fact that Mr. Hernandez Mendez is on two diabetes

drugs demonstrates the severity of his diabetes.  There has been no final determination of

whether Mr. Hernandez will be allowed to remain in the United States.  Id.

Petitioner Felipe DeLima Moreira Barros is civil immigration detainees at Plymouth County.  Mr. Barros is 27 years old and suffers from asthma.  He requires the use of an inhaler, which, at present he does not have. Id.

Because the petitioners are medically vulnerable individuals and they are especially at risk due to the COVID-19 pandemic.  There release from custody is necessary to protect them from infection.

**ARGUMENT**

**1.     Petitioners have standing**

The Petitioners are in a facility that cannot protect them from the COVID-19 pandemic disease that may cause severe illness, organ damage and death.  They are not able to concede that any set of conditions or ameliorations carried out at PCCF would be able to protect them from a violation of their constitutional rights because of the predictable effects of COVID-19 infection on medically vulnerable detainees.  Contrary to the position of the respondent, the petitioners do have standing.   Petitioners have shown a particularized and imminent harm that is traceable to the respondent's detention of them, and that would be redressed through habeas relief.  See Steel Co. v. Chicago Steel & Pickering, 523 U.S. 83, 103-03 (1998), Amhein v eClinical Works, LLC, 954 F.3d 328, 330 (1st Cir. 2020).  The Court should reject the respondent's arguments, as the court did recently in the Savino v. Hodgson, class action.  See No. 20-10617, 2020 WL 1703844, at *4 (D. Mass. Apr. 8, 2020).  Moreover, no set of conditions, or ameliorations, can protect the petitioners from imminent, predictable harm from the highly communicable and virulent COVID-19 virus that is fairly traceable to the respondent.  Malam v. Adducci, No. 20-10829, 2020 WL 1672662, at * 8 (E.D. Mich. Apr. 5, as amended (Apr. 6, 2020) (citing,  Nelson v.

Campbell, 541 U.S. 637, 644-45 (2004) ("if as a factual matter petitioner were unable or unwilling to concede acceptable alternatives … coupled with injunctive relief … [this] would call into question the … sentence itself)).

      a. Petitioners have standing to protect themselves from predictable, not merely speculative harm, that is fairly traceable to respondent's detention of the petitioners

      Yet, to establish standing, "a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about.'" Massachusetts v. U.S. Dep't of Health & Human Servs., 923 F.3d 209, 225 (1st Cir. 2019).   Likely results that are "predictable" are sufficient. Department of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019).  Additionally, the Supreme Court has held that "future injuries" may support standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  Department of Commerce v. New York, 139 S.Ct. 2551, 2565 (2019) (quoting Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014)).

      b. Petitioners have standing because habeas relief would redress their injury by allowing them to safely isolate at home

      For all these reasons, petitioners' injury is redressable exactly, and exclusively, through the remedy of release that he has claimed.  Hutto v. Finney, 437 U.S. 678, 687 n.9 (1978); Savino, 2020 WL 1703844, at *4 ("This risk of injury is traceable to the government's act of confining the Detainees in close quarters and would of course be redressable by a judicial order of release or other ameliorative relief.");  Moreover, the Petitioners are not challenging the conditions of their confinement but the fact that no set of conditions, or ameliorations, however well intended would be enough to prevent irreparable constitutional injury and such a case is a challenge to legality of the detention itself and therefore cognizable under habeas.  Malam v.

Adducci, No. 20-10829, 2020 WL 1672662, at * 8 (E.D. Mich. Apr. 5, as amended (Apr. 6, 2020) (citing, Nelson, 541 U.S. at 644-45).

## II.    Due Process Principles require that Petitioners be released

The Eighth Amendment requires that "inmates be furnished with basic human needs, one of which is 'reasonable safety.'" Helling v McKinney, 509 U.S. 25, 33 (1993) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989)). Accordingly, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet has happened to them." Id. The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition in their prison on the ground that nothing had yet happened to them." Id. The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens 'reasonable safety." Id.

Immigration detainees, even those with prior criminal convictions, are civil detainees held pursuant to civil immigration laws. Zadvydas v. Davis, 533 U.S. 678, 690 (2001).

For pretrial and civil detainees, due process "provides at least as much protection … as the Eighth Amendment provides for convicted inmates." Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007); accord Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990). Indeed, civil detainees, like the petitioners here, are entitled to conditions of confinement that are superior to those of convicted prisoners. See Alves v. Murphy, 530 F.Supp. 2d 380, 387 (D. Mass. 2008); see also King v. Cty. of Los Angeles, 885 F.3d 548, 557 (9th Cir. 2018); Jones v. Blanas, 393 F.3d 918, 933-34 (9th Cir. 2004).

Consequently, under the Due Process Clause, pretrial and civil detainees, like the petitioners, may not be subject to the conditions that amount to punishment, including conditions that fail to "reasonably relate [] to a legitimate governmental objective. Bell v. Wolfish, 441 U.S. 520, 539 (1979); accord Lyons v. Powell, 838 F.2d 28, 29 (1st Cir. 1988). Accordingly, the First Circuit has found that, at a minimum, detention conditions are unconstitutional where they: (1) objectively deny a minimal measure of necessities required for civilized living; and (2) are imposed with deliberate indifference to inmate health or safety. Surprenant v. Rivas, 424 F.3d 5, 18-19 (1st Cir. 2005); Reaves v. Dep't of Corr., 333 F.Supp. 3d 18, 26 (D. Mass. 2018); Couchon v. Cousins, No.17-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018).

Additionally, the Due Process Clause protects detainees, like the petitioners, not only from conduct amounting to deliberate indifference, but also from objectively unreasonable conduct that creates a risk to their safety. See Kingsley v. Hendrickson, 135 S. Ct. 2466, 2472-73 (2015); Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018); Gordon v. Cty. of Orange, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018). The language of Kingsley is broad – applying not only to the use of excessive force by the government, but to government action generally, including actions involving medical treatment. See Gordon, 888 F.3d at 1124; see also Couchon, 2018 WL 4189694, at *6 (noting that there is "much to be said" for reasoning that extends Kingsley to conditions of confinement cases).

III.    **Under cases like *Mapp v. Reno,* the Court can order Petitioners and other detainees Released to safety while it considers their claims.**

In Mapp v. Reno, the Court found that the inherent power the court has to release on bail a habeas petitioner who challenges his detention after a criminal conviction extending to a civil detainee in INS custody. 241 F.3d 221, 223 (2nd Cir. 2001). In the case of the petitioners,

"extraordinary" and "exceptional" circumstances do exist, and the court may exercise its power

to grant bail in this special case.  Id. at 226.  In the case of the petitioners, the grant of bail is

*necessary* to make the habeas relief effective.  Id.


IV.     **The Court has jurisdiction and authority to order the release of Petitioners and other detainees as a final remedy**

"[H]abeas corpus is, at its core, an equitable remedy," Schlup v. Delo, 513 U.S. 298, 319

(1995), and "[f]ederal courts possess whatever are necessary to remedy constitutional violations

because they are charged with protecting these rights." Stone v. City & Cty. of San Francisco,

968 F.2d 850, 861 (9th Cir. 1992).  As a result, "[w]hen necessary to ensure compliance with a

constitutional mandate, courts may enter orders placing limits on a prison's population." Brown

v. Plata, 563 U.S. 493, 511 (2011); see also 28 U.S.C. § 2243, Boumediene v. Bush, 553 U.S.

723, 779-80 (2008) (explaining that "common-law habeas corpus was, above all an adaptable

remedy," that the "habeas court's role was most extensive in cases of pre-trial and noncriminal

detention," and that "when the judicial power to issue habeas corpus is properly invoked the

judicial officer must have adequate authority … to formulate and issue appropriate orders for

relief, including, if necessary, an order directing the prisoner's release").

Courts have regularly exercised authority to remedy constitutional violations caused by

overcrowding.  See e.g., Duran v. Elrod, 713 F.2d 292, 297-98 (7th Cir. 1983) (concluding that

the court did not exceed its authority in directing release of low-bond pretrial detainees as

necessary to reach a population cap).  The same principle applies here.  As the constitutional

principles and public health experts make clear, releasing the petitioners on conditions is the only

viable remedy to ensure their safety, and falls well within the Court's habeas jurisdiction and

authority.  See e.g., Gonzalez-Fuentes v. Molina, 607 F.3d 864 (1st Cir. 2010).

## **CONCLUSION**

For all the foregoing reasons, and those contained in the petition and the record in this case, the petitioners respectfully request that this petition be allowed, and that he released from detention immediately to self-isolate on such conditions as the Court deems appropriate.

Dated: April 29, 2020                                      Respectfully submitted,


                                                          /s/ Stephen A. Lagana
                                                          Stephen A. Lagana (BBO# 565811)
                                                          Lagana & Associates
                                                          145 Essex Street
                                                          Lawrence, MA 01840
                                                          T: 978-794-2331
                                                          E: lagana.law@gmail.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the EFC system will be sent by first class mail, postage prepaid, to the respondent at the following address:

> Andrew E. Lelling,
> United States Attorney
> United States Attorney's Office
> 1 Courthouse Way, Suite 9200
> Boston, MA 02210

Dated: April 29, 2020

/s/ Stephen A. Lagana
Stephen A. Lagana
Attorney for the Petitioners